IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| ALEXANDER R. DEANDA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2:20-CV-92-Z |
| | § | |
| ALEX AZAR II, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**ORDER**

This matter comes before the Court on Defendant's Motion to Dismiss, filed June 19, 2020 (ECF No. 10) ("Motion"). Plaintiff seeks to certify a class action lawsuit against Defendants' administration of the federal Title X family planning program, 42 U.S.C. § 300(a). As named plaintiff for a prospective class of Texas parents, he asks this Court to declare that Title X grantees must secure "parental consent" before dispensing contraceptives to minors residing in Texas— and to enjoin Defendants from acting otherwise. As named plaintiff for a prospective class of parents *nationwide*, he asks this Court to declare that Title X grantees must secure "parental consent" before dispensing contraceptives to minors because the Due Process Clause of the Fourteenth Amendment guarantees the "fundamental liberty interest of natural parents in the care, custody, and management of their child"—and to enjoin Defendants from acting otherwise. *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Defendants move to dismiss the Complaint on the theory that Plaintiff lacks standing and fails to state a redressable claim. For the reasons below, the Court DENIES the Motion.

BACKGROUND

Plaintiff is a Christian who is "raising each of his daughters in accordance with Christian teaching on matters of sexuality, which requires unmarried children to practice abstinence and refrain from sexual intercourse until marriage." *See* Complaint ¶¶ 19–21, at 5. Texas Family Code § 151.001(a)(6) facilitates or at least *strengthens* Plaintiff's free exercise of religion in this regard by requiring that health clinics obtain "parental consent" before prescribing or dispensing contraceptives to minors. *See id.* ¶¶ 7–10, at 2–3. Here, Plaintiff alleges the Defendants' administration of Title X impedes this statutory right because Defendants (1) fail to *monitor* grantees to ensure compliance, and (2) continue to *fund* grantees that violate Texas Family Code § 151.001(a)(6). *See id.* ¶¶ 23–28, at 5–7.

Arguing that Title X does not preempt "parental consent" laws, Plaintiff alleges loss of his statutory rights and asks this Court to declare that Texas Family Code § 151.001(a)(6) applies to all Title IX grantees in Texas. *See id.* ¶¶ 12–17, at 3–5; *id.* ¶¶ 29–30, at 7. Plaintiff further requests that this Court enjoin Defendants from funding any Texas-based Title X grantee that fails to comply with Texas Family Code § 151.001(a)(6). *See id.* ¶ 31, at 7. Plaintiff brings these claims on behalf of a prospective class of every similarly situated parent in Texas. *See id.* ¶ 32, at 8; *id.* ¶¶ 45–53, at 10–11.

Next, Plaintiff alleges a *national* harm affecting a prospective *nationwide* class: Defendants' failure to obtain "parental consent" before dispensing contraceptives to minors violates Plaintiff's "constitutional right to direct the upbringing of [his] children." *See id.* ¶¶ 33–35, at 8 (citing *Pierce v. Society of Sisters*, 268 U.S. 510, 534 (1925), *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)). Plaintiff asks this Court to declare same and to enjoin Defendants from funding any Title X grantees in the United States that fail to obtain "parental consent" before prescribing

2

or dispensing contraceptives to minors. *See id.* ¶ 36, at 8. Plaintiff brings this claim on behalf of a prospective class of every similarly situated parent in the United States. *See id.* ¶ 37, at 9; *id.* ¶¶ 45–53, at 10–11.

Defendants move to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b) based on three arguments. First, Plaintiff lacks standing because he alleges a *future* injury that is improbable and untraceable. *See* Brief in Support of Motion to Dismiss 10–13, filed June 19, 2020 (ECF No. 11) ("Brief in Support"). Second, Plaintiff's alleged injuries are not remediable because Title X requires that grantees "encourage family participation" only "to the extent practical," permissive and precatory language that preempts any state law requiring full parental consent. *Id.* at 14–17. Third, Plaintiff's claims are not remediable because Title X programs are *voluntary* and therefore cannot infringe Plaintiff's constitutional parental rights to "care, custody, and control." *See id.* at 17–20; *see Troxel*, 530 U.S. at 65.

In response to the Motion, Plaintiff identifies four remediable injuries-in-fact traceable to Defendants' administration of the Title X program: (1) deprivation of a state statutory right; (2) subversion of his parental rights by Title X grantees who advertise, prescribe, and distribute contraceptives to minors; (3) the *increased risk* that Plaintiff's daughters will access contraceptives via Title X grantees that subvert Plaintiff's statutory and constitutional rights; and (4) the *diminution* of the statutory and constitutional assurance that Title X grantees will obtain "parental consent" before prescribing or dispensing contraceptives to his daughters. *See* Amended Brief in Opposition to Defendants' Motion to Dismiss 6–13, filed July 13, 2020 (ECF No. 14) ("Response to MTD"). Finally, Plaintiff argues that the plain text of Title X does not preempt Texas Family Code § 151.001(a)(6) or otherwise preclude Defendants from imposing "parental consent" requirements on Title X grantees—*i.e.*, the *floor* is not a *ceiling*. *See id.* at 12–17.

3

In Reply, Defendants reiterate that Plaintiff alleges a mere generalized grievance against a Title X program that is voluntary and therefore *avoidable*. *See* Reply in Support of Defendants' Motion to Dismiss, filed July 24, 2020 (ECF No. 15) ("Reply on MTD"). Second, Defendants further reiterate that Plaintiff's alleged injuries-in-fact are not cognizable *or* remediable. *See* Reply on MTD at 3–6. Third, Defendants aver that the "text, purpose, and legislative history of Title X" conflict with "parental consent" requirements like Texas Family Code § 151.001(a)(6), citing Second, Eighth, Tenth, and D.C. Circuit cases holding same. *See id.* at 6–8. Finally, Defendants cite Third and Sixth Circuit cases holding that "voluntary" programs like Title X do not entail the "compelled interference in the parent-child relationship" necessary to violate parental rights. *See id.* at 9 (citing *Anspach v. Philadelphia*, 503 F.3d 256, 262 (3d Cir. 2007); *Doe v. Irwin*, 615 F.2d 1162, 1168 (6th Cir. 1980)).

## LEGAL STANDARDS

### A.  Parental Right to Consent to Children's Medical Treatment under Texas Law

Under Texas common law, fit parents enjoy a fundamental right to make decisions about "the care, custody, and control" of their minor children absent extraordinary risk of harm to those children. *In re C.J.C.*, 603 S.W.3d 804, 807 (Tex. 2020) (quoting *Troxel*, 530 U.S. at 66); *accord In re Derzapf*, 219 S.W.3d 327, 334–35 (Tex. 2007) (stating that the parental rights affirmed in *Troxel* are "the oldest of the fundamental liberty interests."). No state actor may infringe on this fundamental right simply because he or she believes the parent made the wrong decision. *Id.*; *accord In re Scheller*, 325 S.W.3d 640, 642 (Tex. 2010) (explaining that the lower court may not "infringe on the fundamental right of parents to make child rearing decisions simply because [it] believes a better decision could be made.") (quoting *Troxel*, 530 U.S. at 72–73).

4

This right extends to a parent's decision to grant, withhold, or withdraw consent to medical treatment for their children. *See Miller ex rel. Miller v. HCA, Inc.*, 118 S.W.3d 758, 766–67 (Tex. 2003). The Texas legislature subsequently codified this common law right in Chapter 151 of the Texas Family Code, which states: "A parent of a child has . . . the right to consent to the child's . . . medical and dental care, and psychiatric, psychological, and surgical treatment." TEX. FAM. CODE ANN. § 151.001(a)(6) (West 2020).

Pursuant to Supreme Court precedent, this Court must review the statutory history and "congressional intention" to ascertain if Section 151.001(a)(6) grants Plaintiff a statutory right whose deprivation would amount to a *per se* injury. *Cf. Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982). But this Court reviews said history and intent as mere *evidence* of the "ordinary public meaning" of the current statutory language. *See generally* A. SCALIA, A MATTER OF INTERPRETATION 17 (1997) ("It is the *law* that governs, not the intent of the lawgiver. . . . Men may intend what they will; but it is only the laws that they enact which bind us.").

### 1. Statutory History

Shortly after the 1918 Spanish Flu pandemic, the Texas Legislature inserted "parental consent" language into the civil statutes. *Compare* 1911 Tex. Rev. Civ. Stat. *with* 1925 Tex. Rev. Civ. Stat. tit. 71 art. 4443. A detailed description of the parent's statutory right to consent to *medical* treatment did not fully manifest until 1973—nearly half a century later. *See* S.B. No. 168, 63rd Legis. R.S., 1973 Tex. Gen. Laws 1411. Starting in 1974, the Texas Legislature vested in parents "the power to consent to . . . medical, psychiatric, and surgical treatment." *Id.* § 12.04, at 1421. The Texas Legislature further specified that parents are statutorily authorized to sue in state court to enforce these rights. *Id.* §§ 11.02–.03, at 1413.

The Texas Legislature has amended the subsection eight times, recodified it once, and renumbered its provisions.[1] While these revisions weakened other parental rights, the Texas Legislature *strengthened* the parental right to content to medical treatment—by replacing the word "power" with the word "right."[2] *Compare id.* § 12.04, at 1421, *with* Tex. Fam. Code Ann. § 151.001(a)(6).[3] The Texas Legislature further strengthened said right by conferring on parents a *general standing* to sue in Texas state courts. Tex. Fam. Code Ann. § 102.003(a)(1).

### 2. Legislative Intention

The legislative record is sparse but adequately reflects that the codification of the parent's right to consent to medical treatment was uncontroversial. In 1973, Senate Bill No. 168 unanimously passed through two committees without amendment to its parental consent provisions.[4] The companion House bill did the same.[5] There was no opposition to the bill voiced during the Senate floor debate.[6] The bill then passed by a voice vote in the Senate and a non-record vote in the House.[7] No committee or conference reports were generated, and Governor Dolph Briscoe made no signing statement. No legislative record accompanies the amendments entered from 1973 through 1995. House and Senate committee reports on the 1995 amendments reflect that the elected representatives sought to recodify the existing statutes without substantive change.[8]

---

[1] *See* 1975 Tex. Gen. Laws 1260; 1983 Tex. Gen. Laws 5436; 1995 Tex. Sess. Law Serv. Ch. 20 (H.B. 655); 1995 Tex. Sess. Law Serv. Ch. 751 (H.B. 433); 2001 Tex. Sess. Law Serv. Ch. 821 (H.B. 920); 2001 Tex. Sess. Law Serv. Ch. 964 (S.B. 1683); 2003 Tex. Sess. Law Serv. Ch. 1036 (H.B. 913); 2005 Tex. Sess. Law Serv. Ch. 924 (H.B. 383).

[2] Tex. Fam. Code Ann. § 151.001(a)(6) (West 2020).

[3] Elevation took place with an intermediate step, with the "power" formulation first expanding to "rights, privileges, duties, and powers" by 1989. *See* 1989 Tex. Sess. Law. Serv. 371 (West).

[4] *See* S.B. No. 168 Bill Compendium 20–21 &117 (human resource committee's amendments and transmittal letter from markup session); *id.* at 222–232 (same from judiciary committee)

[5] *See* H. Comm. on the Judiciary, Minutes (May 19, 1973), at 1–2, https://lrl.texas.gov/scanned/legisCmteMinutes /houseCmtes/63-0/Judiciary/05191973.pdf (last visited Sept. 24, 2020).

[6] *See* Tex. State Archives, Texas Senate Recordings, 1972–2006, Tape 0095 (May 25, 1973), https://tsl.access .preservica.com/uncategorized/IO_7734a29b-4af8-447d-b5c8-75dc04533df1 (last visited Sept. 24, 2020).

[7] S.B. No. 168 Bill Compendium *supra* note 4, at 436 (reporting on vote in both chambers); *id.* at 355–56 (recording no amendment to pertinent provisions in the final bill text).

[8] *See* H. Comm. on Jurisprudence, H.B. 655: Bill Analysis (June 8, 1995);

The subsections relevant to the parent's legally cognizable right[9] to sue[10] have remained unchanged since 1995.

### B. Constitutional Right to Direct Religious Upbringing of Children

The Fourteenth Amendment to the United States Constitution forbids that any state "deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV, § 1. The Supreme Court has repeatedly held that this clause protects not only procedural due process but also "heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997); *see Reno v. Flores*, 507 U.S. 292, 301–02 (1993). These "fundamental rights and liberty interests" march under the banner of "substantive due process"—though the concept is much disputed.[11]

During the first decades of the postwar era, the list of such fundamental rights grew to include many aspects related to family life, sexuality, and reproduction. *See, e.g., Loving v. Virginia*, 388 U.S. 1, (1967); *Griswold v. Connecticut*, 381 U.S. 479, (1965); *Eisenstadt v. Baird*, 405 U.S. 438 (1972). During more recent decades, though, the Supreme Court has "been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992). The Supreme Court's restraint is rooted in the structure of the Constitution itself, which separates the Article I legislative function from the Article III judicial function. Thus, the Justices are rightly suspicious of *legislation* masquerading as substantive due process:

---

[9] *Compare* 1995 Tex. Sess. Law Serv. § 151.003(a)(6), at 139, *with* TEX. FAM. CODE ANN. § 151.001(a)(6).

[10] *Compare* 1995 Tex. Sess. Law Serv. § 102.003, at 125, *with* TEX. FAM. CODE ANN. § 102.003(a)(1) (West 2020).

[11] *See, e.g.*, Federalist Society, *Second Annual Texas Chapters Conference*, Panel Three, Prerak Shah, Senior Counsel to the Texas Attorney General ("Substantive Due Process is not a thing."); https://fedsoc.org/conferences/second-annual-texas-chapters-conference#agenda-item-texas-and-regulation (last visited Sept. 24, 2020).

As the history of the *Lochner* era demonstrates, there is reason for concern lest the only limits to such judicial intervention become the predilections of those who happen at the time to be Members of this Court. That history counsels caution and restraint. But it does not counsel abandonment....

*Moore v. City of East Cleveland, Ohio*, 431 U.S. 494, 502 (1977)

Most pertinent here, substantive due process encompasses multiple liberty interests related to the "sanctity of the family." *Moore v. City of East Cleveland, Ohio*, 431 U.S. 494, 504 (1977). One such liberty interest is the fundamental right of parents to direct the "care, custody and control" of their children. Any individual has a recognized right to bear children. *See Skinner v. State of Okla. ex rel. Williamson*, 316 U.S. 535, 541 (1942). Once those children are born, parents have a constitutional right to bring them up and control their formal education. *See Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). More expansively, parents may direct all aspects of "the upbringing and education of children under their control." *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35 (1925).

The right emerges from natural law that predates the United States and was not surrendered with ratification of the Constitution: "The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id.* at 535. It has become a cardinal rule of federal jurisprudence that "the custody, care, and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). Such parental authority is so deeply rooted in the "history and culture of Western civilization" that it already nearly five decades ago was "established beyond debate as an enduring American tradition." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972); *accord Parham v. J. R.*, 442 U.S. 584, 602 (1979).

In *Meyer*, the Supreme Court recognized the parental right to "establish a home and bring up children" as a liberty protected under the Fourteenth Amendment. 262 U.S. 390, 299 (1923). In *Pierce*, the Supreme Court held a law which required parents to send their children to public schools unreasonably interfered with "the liberty of parents and guardians to direct the upbringing and education of children under their control." 268 U.S. 510, 534–535 (1925). In *Troxel v. Granville*, the Court held a mother had the "fundamental right to make decisions concerning the rearing of her two daughters" while noting a long history of recognizing "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." 530 U.S. 57, 66–68 (citing *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S. Ct. 1208 (1972); *Quilloin v. Walcott,* 434 U.S. 246, 255 (1978); *Parham v. J. R.,* 442 U.S. 584, 602 (1979); *Santosky v. Kramer,* 455 U.S. 745, 753 (1982); *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)).

### C. Federal Standing

The United States Constitution leaves policymaking power to the legislative and executive branches, conferring upon the federal courts only the judicial power to adjudicate actual cases and controversies. U.S. CONST. art. III, § 1; *June Medical Services L.L.C. v. Russo*, 140 S. Ct. 2103, 2117 (2020); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). This power is limited only to questions "historically viewed as capable of resolution through the judicial process." *Flast v. Cohen*, 392 U.S. 83, 95 (1968); *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006). If a plaintiff presents a federal court with any claim that falls outside the scope of the judicial power, that court must decline to adjudicate the claim. *See Vieth v. Jubelirer*, 541 U.S. 267, 277 (2004) (plurality opinion); *Muskrat v. United States*, 219 U.S. 346, 356 (1911).

One element of the case-or-controversy requirement is that a plaintiff in federal district court must establish he has standing to sue. *See Gill v. Whitford*, 138 S. Ct. 1916, 1923 (2018). The standing inquiry attempts to determine whether the plaintiff is the proper party to bring his suit, *see Raines v. Byrd*, 521 U.S. 811, 818 (1997), although the answer to that question "often turns on the nature and source of the claim asserted," *Warth v. Seldin*, 422 U.S. 490, 500 (1975). Regardless of the nature of the claim, though, a plaintiff does not have standing unless he demonstrates (1) an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) ("*Lujan*"); *Allen v. Wright*, 468 U.S. 737, 751 (1984). He must satisfy these factors even at the pleading stage. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *Warth*, 422 U.S. at 518.

### D.  Motions to Dismiss

In reviewing a motion to dismiss, the Court accepts as true all well-pleaded facts and view them in the light most favorable to the nonmovant. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A plaintiff is required to provide "more than labels and conclusions." *Twombly*, 550 U.S. at 555; *see also Johnson v. East Baton Rouge Federation of Teachers*, 706 Fed. App'x 169 (5th Cir. 2017). "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true." *Twombly*, 550 U.S. at 555.

ANALYSIS

Defendants ask the Court to dismiss the Complaint both for Plaintiff's alleged lack of standing under Rule 12(b)(1) and for his alleged failure to state a remediable claim under Rule 12(b)(6). Because the question of standing is jurisdictional, the Court first examined Plaintiff's pleadings and ascertained in them injuries-in-fact that *are* both fairly traceable to Defendants and redressable in this Court. *See Lujan*, 504 U.S. at 560–61. Next, the Court applied the Fifth Circuit's ascendant checklist approach to "plausibility" under *Iqbal* and *Twombly*—and thereby determined that the Complaint adequately pled "plausible factual content." *Id.* For these reasons and the reasons discussed below, the Court DENIES Defendant's Motion.

### A.  Rule 12(b)(1)

Standing doctrine emerged so haphazardly in the postwar era that by the 1980s both academics and the Supreme Court deprecated it as incoherent and imprecise.[12] In 1992, however, the *Lujan* court regimented the doctrine so that Plaintiff will have standing *if but only if* he satisfies three criteria. First, he must allege an injury that is *both* "concrete and particularized" *and* "actual or imminent." 504 U.S. at 560; *Spokeo*, 136 S. Ct. at 1545. Second, that injury must be fairly traceable to the defendant's alleged conduct. *See id.* Third, it must be likely that a court judgment in the plaintiff's favor would redress his alleged injury. *See id.* at 560–61. The three *Lujan* factors are canonical: the Supreme Court has cited them in nearly seventy subsequent decisions. Both parties briefed and argued the *Lujan* factors in this case.

---

[12] *See, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 475 (1982) ("We need not mince words when we say that the concept of 'Art. III standing' has not been defined with complete consistency in all of the various cases decided by this Court which have discussed it, nor when we say that this very fact is probably proof that the concept cannot be reduced to a one-sentence or one-paragraph definition."); William A. Fletcher, *The Structure of Standing*, 98 YALE L.J. 221, 221 n.5 (1988); Cass R. Sunstein, *Standing and the Privatization of Public Law*, 88 COLUM. L. REV. 1432, 1458 (1988); Stephen L. Winter, *The Metaphor of Standing and the Problem of Self-Governance,* 40 STAN. L. REV. 1371, 1418—25 (1988).

The Court heeds the Supreme Court's recent admonition to its inferior courts to not "make standing law more complicated than it needs to be." *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1622 (2020). In the following paragraphs, the Court evaluates each *Lujan* factor in turn, applying jurisprudential analysis where necessary. *See Campbell v. Louisiana*, 523 U.S. 392, 397 (1998). Because Plaintiff must prove standing on each claim alleged in the Complaint, the Court first analyzes Plaintiff's statutory claim followed by Plaintiff's constitutional claim. *See Gill*, 138 S. at 1934; *Cuno*, 547 U.S. at 353; *In re Gee*, 941 F.3d 153, 160 (5th Cir. 2019).

### 1. Statutory Claim: Texas Family Code

#### a. Injury-in-Fact

Plaintiff asserts federal invasion of a state statutory right *may* create per se injury-in-fact for standing purposes. Plaintiff directs the Court to examples of mostly federal statutes wherein the Supreme Court discerned such per se injury. *See* Response to MTD at 7.[13] Defendants riposte that *may* does not mean *must*, citing the *Thole* court's denial of standing on an ERISA claim. *See* Reply to MTD at 9. Neither party retrieved a Supreme Court or Circuit case that definitively defines the difference between *may* and *must*—or how the Court should analyze the space between.

Nevertheless, three uncited cases provide some guidance. In *Sierra Club v. Morton* and later in *Linda R.S. v. Richard D.*, the Supreme Court acknowledged that standing may exist independent of concrete injury-in-fact *if* the plaintiff relies on a "specific statute authorizing invocation of the judicial process." 405 U.S. 727, 732 (1972); *see* 410 U.S. 614, 617 & n.3 (1973); *see also Havens Realty Corp.*, 455 U.S. at 373 ("As we have previously recognized, '[t]he actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights,

---

[13] Plaintiff misreads *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), which addressed whether *prudential* considerations could deprive a plaintiff of standing vis-à-vis a fair housing claim *even though* plaintiff satisfied the *constitutional* minimum requirement of injury-in-fact. 455 U.S. at 472. However, the remaining cases cited in Plaintiff's Response substantiate his argument.

the invasion of which creates standing.'") (collecting cases). Such authorization is to be construed generously. *Trafficante v. Metropolitan Life Ins. CO*, 409 U.S. 205, 212 (1972). For example, in *Havens Realty*, the Supreme Court relied on "congressional intention" to determine that the statutory words "any person" conferred standing on "testers" seeking to identify Fair Housing Act violations—even though said "testers" approached landlords "without any intention of buying or renting a home." 455 U.S. at 373-74.

Here, the Texas Legislature expressly conferred a legal right. The plain text of Texas Family Code § 102.003(a)(1) grants parents general standing to sue in state courts to vindicate their consent rights under Section 151.001(a)(6). Senate Bill No. 168 of 1973 already created a legally cognizable claim for parents vis-à-vis consent nearly five decades ago. *Compare* 1973 Tex. Gen. Laws §§ 11.02–.03, *with id.* § 12.04, at 1421. Although subsequent amendments have narrowed or weakened some *abutting* parental rights, the Texas Legislature has left inviolate parents' right of medical consent. Furthermore the Texas Legislature has piecemeal *strengthened* this protection by clarifying that the nascent "power" is a full-bore statutory "right." *Compare id.* § 12.04, at 1421*, with* TEX. FAM. CODE ANN. § 151.001(a)(6) (West 2020). Even when the Court reads the statutory text through various semiotic, deconstructionist, or phenomenological lenses,[14] the Court reaches the same unavoidable conclusion: the Texas Legislature intended to grant parents a legally-enforceable right of medical consent.

Nor does anything in the legislative history suggest Texas legislators in 1973 or 1995 understood these provisions in any way that varies from their plain meaning. The language generated no debate in committee or on the floor in either chamber in either year. Moreover,

---

[14] *See, e.g.*, JOHN LOCKE, AN ESSAY CONCERNING HUMAN UNDERSTANDING 173–75 (Kenneth P. Winkler ed. 1996) (1689); JACQUES DERRIDA, OF GRAMMATOLOGY 69–70 (Gayatri Spivak trans., Johns Hopkins Univ. Press 2016); MARTIN HEIDEGGER, BEING AND TIME 26–32 (Joan Stambaugh trans., State Univ. of New York Press 2010).

*Havens Realty* only envisioned legislative history as a one-way ratchet that *expands* standing if statutory language is ambiguous. Thus, the Court must conclude Plaintiff has suffered a per se statutory injury in fact.

### b. Causality

Plaintiff suffered a per se injury-in-fact through deprivation of a statutory right, but must also demonstrate that the Defendants *caused* his injury. *See, e.g., Warth*, 422 at 506–07. Defendants deny causality because the "chain" connecting Plaintiff's injury to Defendant's conduct runs through two sets of independent actors. First, one of Plaintiff's daughters must voluntarily choose to seek contraception without his consent. *See* Motion at 18–19. Second, two levels of Defendants' Title X grant recipients—the direct grantee and the grantee's local subrecipients in the Amarillo area—must independently fail to comply with Texas parental consent laws. *See* Tr. 60:11–62:16.[15] Defendants argue that Plaintiff may not "fairly trace[]" his alleged injury through these casual chains because standing cannot "'rest on speculation about the decisions of independent actors.'" Motion at 17 (quoting *Clapper*, 568 U.S. at 413–14).

Plaintiff did not present a counterargument to the causality prong of *Lujan* in his pleadings, but did argue at the Hearing that Defendants directly and traceably *cause* the alleged injury by "telling" their grant recipients to ignore Texas Family Code § 151.001(a)(6) because Title X preempts state parental consent laws. *See* Tr. 66:1–67:25. When pressed to explain *how* Defendants "tell" their grant recipients to disregard state law—for example, guidance memorandum or directive program policy notice—Plaintiff insisted he need not "plead that level of detail" in his Complaint. Tr. 67:24.

---

[15] All references to the hearing transcript refer to the court reporter's rough draft, completed September 1, 2020.

In recent years, the Supreme Court has required *some* fact-dependent degree of "proximity" between Plaintiff's alleged injury and Defendant's action or inaction. *E.g.*, *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1305–1306 (2017); *Lexmark Intern. v. Static Control Components*, 572 U.S. 118, 132 (2014). Yet the bar for proving causality at the pleading stage remains low and permits that cause be attributed to a Defendant even if the harm ripples through multiple other actors—or even just "contributes" in a "scientifically imprecise" way to a harm others would still inflict on a plaintiff absent defendant's challenged conduct. *See Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1522–24 (2019); *Massachusetts v. EPA*, 549 U.S. 497, 523–25 (2007); *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.2d 546, 557–58 (5th Cir. 1986).

At this MTD phase, the Court must accept as true all well-pleaded facts and view them in the light most favorable to the nonmovant. *Dorsey*, 540 F.3d at 338. If the Court accepts as true Plaintiff's claim Defendants "tell" their grantees not to comply with Texas parental consent law, the causal link between alleged injury and Defendants' action is incontrovertible. Here, it is "probable" that Defendants' continued funding of non-compliant grantees makes it more likely that grantees and subrecipients will not comply with Texas Family Code § 151.001(a)(6). *Warth*, 422 U.S. at 504. Conversely, if Defendants cease funding non-compliant grantees, it is substantially likely the clinics would act in a way that reduces the odds of Plaintiff's alleged future injury. *See Village of Arlington Heights*, 429 U.S. at 260. Cause can flow upstream through Defendants' grantee even if said grantee would *independently* decide not to comply with Texas Family Code § 151.001(a)(6) absent Defendants' grants. *See Massachusetts v. EPA*, 549 U.S. at 523–25; *Duke Power Company*, 438 U.S. at 74–75. Thus, the Court concludes Plaintiff satisfies the *Lujan* causality requirement.

### c. Redressability

Redressability is a "separate and equally important" element of standing—but neither party devoted much ink or argument to the subject matter. *Simon*, 426 U.S. at 38 n.16; *Spokeo, Inc.*, 136 S. Ct. at 1547; *Warth*, 422 U.S. at 518. Plaintiff asserts that the declaratory and injunctive relief he seeks would redress his alleged injuries, though he does not detail the mechanism by which this would happen. *See* Tr. 5:6–11. Defendants do not directly address redressability, but appear to rely on the Supreme Court's redressability analysis in *Thole*. *See* Reply to MTD (ECF No. 15, at 9) ("[T]he Supreme Court recently rejected as insufficiently *concrete* a claim founded upon an alleged statutory right where the plaintiffs failed to show a "substantially increased risk.") (citing *Thole*, 140 S. Ct. at 1622) (emphasis added).

The early standing cases *Linda R.S.* and *Warth* established that an injury caused by a defendant is not redressable if both (1) an intervening party would engage in the identical behavior absent the challenged conduct; and (2) the plaintiff would suffer the same harm absent the challenged conduct. *See Warth*, 422 U.S. at 506–08; *Linda R.S.*, 410 U.S. at 618; *see also McConnell v. FEC*, 540 U.S. 93, 227–29 (2003). "Substantial likelihood" of the requested relief redressing the alleged injury is enough to pass muster in standing analysis. *Duke Power*, 438 U.S. at 74–75 & n.20. The relief need not remedy the entirety of the alleged injury. *See Massachusetts*, 321 U.S. at 1458. Redressability is satisfied even if relief must filter downstream through third parties uncertain to comply with the result, provided the relief would either (1) remove an obstacle for a nonparty to act in a way favorable to the plaintiff, or (2) influence a nonparty to act in such a way. *See Larson v. Valente*, 456 U.S. 228, 242–44 (1982); *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 396–98 (5th Cir. 2015); *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565–66 (2019).

Here, it is substantially likely a declaratory judgment and injunctive relief would redress Plaintiff's alleged statutory injury. *See Duke Power*, 438 U.S. at 74–75. Title X subrecipients in Region VI—which includes Texas—depend on Defendants' grants for roughly thirty percent of their total revenue. *See* HHS OFFICE OF POPULATION AFFAIRS, 2019 Title X Family Planning Annual Report 56, Exhibit 32 (Sept. 2020), https://opa.hhs.gov/sites/default/files/2020-09/title-x-fpar-2019-national-summary.pdf (last visited Sept. 24, 2020). Defendant's currently instruct those subrecipients that "Title X projects may not require written consent of parents or guardians for the provision of services to minors" or "notify a parent or guardian before or after a minor has requested and/or received Title X planning services." OPA Program Policy Notice 2014-01 (June 5, 2014). If Plaintiff obtains his requested relief, Defendants' heavy financial influence over its grantees and subrecipients is substantially likely to influence them to comply with Texas parental consent laws. *See Dep't of Commerce*, 139 S. Ct. at 2565–66.

In sum, Plaintiff's claim under Texas Family Code § 151,001(a)(6) satisfies all three standing requirements set forth in *Lujan*—injury-in-fact, causality, and redressability. This Court has discretion to override that standing for prudential reasons—*e.g.*, the rules against litigating (1) "generalized grievances" or (2) the "rights of a third party" or (3) outside the "zone of interest." *See, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 162–66 (1997); *Ankenbrandt v. Richards*, 504 U.S. 689, 703 (1992); *Mansell v. Mansell*, 490 U.S. 581, 587 (1989); *Moore v. Sims*, 442 U.S. 415, 435 (1979). But this case does not implicate any of the aforementioned categories. *See Palmore v. Sidoti*, 466 U.S. 429, 432–34 (1984). The Court therefore declines to invoke prudential reasons to void Plaintiff's standing on his claim under Texas Family Code § 151.001(a)(6). Defendants' motion that the Court dismiss that claim under Rule 12(b)(1) of the Federal Rules of Civil Procedure is DENIED.

### 1. *Constitutional Claim: Parental Rights to "Care, Custody, Control"*

#### *a. Injury-in-Fact*

Plaintiff alleges Defendants' administration of the Title X program subjects him to three injuries that are cognizable under "substantive due process" jurisprudence. First, he analogizes to "condom cases" to argue that Defendants are subverting his constitutional parental authority by providing an *option* for his daughters to obtain contraception sans parental consent. *See* Response to MTD at 9–10. Second, Plaintiff argues he has "lost the assurance . . . the law of Texas would otherwise provide" that his daughters will be unable to obtain family planning services without parental consent. *See id.* at 10–11. Third, Plaintiff avers that Defendants' acts and omissions in administering the Title X program increases the *risk* one or more of his daughters will contravene the religious instruction received from their parents. *See id.* at 11–13 (citing *Massachusetts v. EPA*); Tr. 6:13–17; *id.* at 24:24–25:6.

Defendants counter Plaintiff's first and third argument—but not his second argument. Regarding the first argument, Defendants rejoin that (1) Plaintiff failed to factually allege that his daughters ever sought contraception without parental consent, and (2) Plaintiff's manifest commitment to religious instruction *reduces* the risk of the alleged injury. *See* Motion at 18-19. Regarding the third argument, Defendants aver that the attenuated probabilistic analysis applied in *Massachusetts v. EPA* court is inapplicable for two reasons: (1) the Plaintiff in that case was a sovereign state, which enjoys "special solicitude" in standing analysis; and (2) the case considered standing to sue on a *procedural* rather than a substantive right. *See* Reply to MTD at 6–7 & 10; Tr. 22:11–23:11.

Plaintiff's second argument fares best. For decades, the Supreme Court has held that plaintiffs can prove injury sufficient to obtain standing by alleging noneconomic harms—provided

those harms are concrete, particularized, and imminent. *See Sierra Club v. Morton*, 405 U.S. 727, 734–36 (1972). Such noneconomic injuries can include informational harm—if the defendant withholds information plaintiff is *statutorily* entitled to receive. *See Havens Realty*, 455 U.S. at 373–74. It is irrelevant whether a plaintiff would make use of such information; the withholding itself constitutes "concrete" and "particularized" injury if withheld from the plaintiff himself, not a third party. *See id.*[16] Accepting the truth of facts alleged by Plaintiff, Defendants inflict a cognizable informational harm when they "tell" Title X grantees and subrecipients to deny Plaintiff the information he is entitled to receive under Texas Family Code § 151.001(a)(6). Because the injury is ongoing, it is by definition "imminent."

Plaintiff's third argument also passes muster. Defendants correctly note that sovereign states deserve "special solicitude" when analyzing probabilistic injuries under *Massachusetts v. EPA*, but ignore that the Supreme Court there was focused on *degree* not *kind*. States may indeed prove standing based on concatenated probabilities too negligible to grant standing to a private plaintiff. Nevertheless, a private plaintiff can also suffer a probabilistic injury-in-fact—if the injury is concrete, particularized, imminent, and has some geographic and temporal nexus to the plaintiff. *See Gill*, 138 S. Ct. at 1923; *Clapper*, 568 U.S. at 411–14; *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC)*, 528 U.S. 167, 1814 (2000). The increased risk of harm need not be large: "an identifiable trifle is enough for standing." *SCRAP*, 412 U.S. at 689 n. 14; *see also Whitmore v. Arkansas*, 495 U.S. 149, 159 (1990). Nor does the increase in risk need to be calculated or even known by the Plaintiff with mathematical precision. *See Gertz v. Robert Welch, Inc*, 418 U.S. 323 (1974). But it may not be based *solely* on a long chain of improbabilities. *See Clapper*, 568 U.S. at 411–14; *City of Los Angeles v. Lyons*, 461 U.S. 95, 102–109 (1983).

---

[16] *See also* Cass R. Sunstein, *Informational Regulation and Informational Standing:* Akins *and Beyond*, 147 U. PA. L. REV. 613, 616 (1999).

Defendants' administration of Title X grants in Potter and Randall Counties easily satisfies this meager standard for "increased risk." Title X subrecipients in Region VI dispense contraception to approximately 22,000 girls under the age of eighteen each year. *See* HHS OFFICE OF POPULATION AFFAIRS, 2019 Title X Family Planning Annual Report 12, Exhibit 4 (Sept. 2020). All family planning clinics in Texas that do *not* receive Title X funds must with rare exception obtain parental consent to dispense contraception to a minor, *see* Texas Family Code § 151.001(a)(6), but Defendants have written guidance instructing their grant recipients that they may not require parental consent, *see* OPA Program Policy Notice 2014-01 (June 5, 2014). If even one Title X subrecipient near Amarillo follows Defendants' guidance in interacting with a single minor, it is a mathematical truism that the action increases Plaintiff's probability of harm. [17]

Given the number of Title X grantees and subrecipients in Region VI and the number of minor girls to whom they dispense contraception, the odds of this net "increased risk" occurring asymptotically approach 100% and thereby make it "concrete." Because Title X clinics are open most days, they pose an ongoing, continuous, and imminent risk to Plaintiff that is not part of a "chain" of speculative improbabilities. *See Clapper*, 68 U.S. at 411–14; *Lyons*, 461 U.S. at 102–109. Nor does it rely on excessive "guesswork." *Center for Biological Diversity v. EPA*, 937 F.3d 533, 537 (5th Cir. 2019). Consequently, Plaintiff has adequately alleged injury-in-fact on his substantive due process claim.

---

[17] Incidentally, this truism is represented in more rigorous algebraic form as $\sum_{2020}^{t}[1 - \prod_{d=1}^{3}(1 - x\lambda_{dt}y\alpha_t)]$, where the risk of Plaintiff's daughters accessing contraception is some function of their combined likelihood to rebel ($\lambda$) and the marginal increase in accessibility of contraception to minors in Texas due to Title X funding ($\alpha$). This likelihood to rebel is going to vary by daughter ($d$) and year ($t$). Accessibility reasonably may but does not need to vary by year ($t$). The relative strength of rebelliousness and accessibility in each daughter's decision whether to rebel can but need vary, resulting in weights ($x$) and ($y$). The probability of the Plaintiff having any of his daughters access contraception without his knowledge in a given year is equal to one minus the product of his daughters' individual probabilities in that same year. If one sums the total probabilities from the year 2020 to the year $t$ (the last year any of his teenaged daughters still is a minor), this equation gives the increased probability of them accessing contraception as minors due to Title X. If that value exceeds zero, Plaintiff demonstrates injury under *Massachusetts v. EPA* and its progeny.

### b. Causality and Redressability

Plaintiff's constitutional theory of harm relies on the same facts as Plaintiff's theory of harm under Texas Family Code § 151.001(a)(6). The Court hereby incorporates by reference its causality and redressability analyses on pages 14–17. The Court thereby concludes that Plaintiff alleges a constitutional injury both "caused" by Defendants and "redressable" by this Court. Plaintiff's claim pertaining to his right to direct the religious upbringing of his children satisfies all three constitutional requirements set forth in *Lujan*. Though the Court has discretion to override that standing for prudential reasons, s*ee, e.g.*, *Bennett v. Spear*, 520 U.S. at 162–66, it declines to do so. Consequently, Defendants' Motion to dismiss Plaintiff's constitutional claim pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure is DENIED.

### B. Rule 12(b)(6)

#### 1. Statutory Claim: Texas Family Code

Defendants argue in the alternative that Plaintiff fails to state a claim upon which the Court can grant relief pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Motion at 19–26. Defendants argue that the right to parental consent for medical procedures codified at Texas Family Code § 151.001(a)(6) cannot bind a federal agency to impose conditions on its Title X grantees and subrecipients that would impede operation of the program. *See id.* at 20; *see also* Tr. 48:14–49:4. Relying on a line of appellate cases outside the Fifth Circuit, Defendants argue that 42 U.S.C. § 300(a) authorizes Defendants to "encourage"— not mandate—parental participation in minors' family planning decisions "[t]o the extent possible." *Id.* at 20–21. They see this as a hard ceiling that actively forbids them from complying with Texas parental consent laws. *See id.* at 21–23.

Plaintiff responds that the federal statutory language creates a *floor*, not a *ceiling*, for what Defendants must do to involve parents in their minor children's family planning decisions. *See* Tr. 41:23-42:5. That is, Defendants must nationwide *at least* encourage patients to involve their parents in the contraception decision process—but nothing in the statute *forbids* Defendants from ensuring their grantees comply with more exacting state standards. *See* Response to MTD at 16. Furthermore, because Texas Family Code § 151.001(a)(6) facially binds any entity that operates inside Texas, Plaintiff contends Defendants' obligation to encourage family participation to the extent *possible* requires them to require their grant recipients to comply with state law. *See* Tr. 36:9–25. Plaintiff reads the HHS 2019 Final Rule located in the Federal Register at 7751 and 7752 to strengthen this obligation. *See* Tr. 38:18–40:2.

Plaintiff acknowledges the non-Fifth Circuit cases cited in Defendants' briefing, but avers that said cases are non-binding. *See id.* at 16–17. Plaintiff further argues that these cases should not be considered even *persuasive* authority, because they (1) focus on "legislative history" and "legislative intent" rather than the "ordinary plain meaning" of the statutory text; and (2) nowhere explain how the *text* of 42 U.S.C. § 300(a) can or does preempt state laws such as Texas Family Code § 151.001(a)(6). *See id.*; Tr. 28:1–19. Plaintiff argues that preemption is improbable in this case because the field of family law is generally reserved to the states and 42 U.S.C. § 300(a) contains no express statutory preemption provision. *See id.* 15–17 (citing *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981); *South Dakota v. Dole*, 483 U.S. 203, 207 (1987); *Will v. Michigan Dep't of Police*, 491 U.S. 58, 65 (1989)).

### a. Fifth Circuit Test

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. at 678. This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. A plaintiff is required to provide "more than labels and conclusions." *Twombly,* 550 U.S. at 555; *see also Johnson,* 706 Fed. App'x at 169 (5th Cir. 2017). "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true." *Twombly,* 550 U.S. at 555.

To establish whether Plaintiff's claim under Texas Family Code § 151.001(a)(6) is plausible, the Court needs to take up to three steps. First, it must determine whether the state law is obviously preempted by the Title X statute. Second, if the state statute is *not obviously* preempted, the Court must determine whether success on the merits of Plaintiff's statutory claim is rendered *default implausible* by the presence of estoppel, legal immunity, laches, preclusion, improper joinder, failure to exhaust administrative remedies, or the statute of frauds.[18] Third and last, if his statutory claim is neither obviously preempted nor default implausible, the Court should check whether Plaintiff's complaint answers with some degree of specificity the six interrogative pronouns — who, what, where, when, why, and how. If a plaintiff's claims satisfies this final criterion, the Court should presume the plaintiff to have a plausible claim absent plain absurdity.[19]

---

[18] *See Loupe v. O'Bannon,* 824 F.3d 534, 539 (5th Cir. 2016); *Davidson v. Georgia-Pacific, L.L.C.*, 819 F.3d 758, 765 (5th Cir. 2016); *Miller v. BAC Home Loans Servicing, L.P.,* 726 F.3d 717, 726 (5th Cir. 2013); *Backe v. LeBlanc*, 691 F.3d 645, 649 (5th Cir. 2012); *City of Clinton, Ark. v. Pilgrim's Pride Corp.*, 632 F.3d 148, 155 (5th Cir. 2010).
[19] *See* Colleen McNamara, Note, *Iqbal as Judicial Rorschach Test,* 105 Nw. U. L. Rev. 401, 417-19 (2011).

### b. Whether Preemption is Obvious

Thus, the threshold question on Plaintiff's statutory claim: does the Title X statute preempt Texas Family Code § 151.001(a)(6)? As always, the Court starts with the statutory text, whose express terms trump all other sources of statutory interpretation. *See Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1737 (2020). The codified Title X statutory text at issue in this case reads as follows:

> The Secretary is authorized to make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents). **To the extent practical**, entities which receive grants or contracts under this subsection shall encourage familiy [sic] participation in projects assisted under this subsection.

42 U.S.C. § 300(a) (emphasis added).

Here, Plaintiff and Defendants ultimately disagree about whether Congress emphasized the first word or the last two words of the bolded text. Plaintiff argues that Congress required Title X grantees to encourage family participation in minors' contraception decisions to the greatest *extent practical*—given each state's law. Defendants contrarily insist Congress required Title X grantees to only encourage family participation *to* the extent practical.

The plain text can support either interpretation. Because ambiguity remains, the Court next turns to the canons of statutory construction. The anti-surplusage canon suggests Congress did not intend the bolded introductory clause to be meaningless—and an introductory clause under the grammar and syntax rule ought to modify the first noun-verb pair of the main clause. Neither canon clearly resolves interpretation of the clause in favor of either party to this case. The constitutional

canons against (1) federal invasion of core state functions;[20] and (2) against preemption[21] both tilt the scales slightly—but far from definitively and unambiguously—in Plaintiff's favor.

Because of the remaining ambiguity, the Court turns to the legislative record for persuasive evidence as to "original public meaning." Because Defendants rely heavily on the D.C. Circuit's construction of the 1977 Senate Committee Report accompanying Title X reauthorization in *Planned Parenthood v. Heckler*, this Court starts with *Heckler*. Reply to MTD at 10-12; 712 F.2d 650 (D.C. Cir. 1983). In *Heckler*, the D.C. Circuit interpreted multiple legislative documents correctly, but misconstrued the relevant Senate Report. *See* S. Rep. No. 102, 95th Cong., 1st Sess. 20–26 (1977) ("1977 Senate Report"). Selectively citing *one section* of Paragraph 7 but ignoring abutting sections *specifically* and the Senate Report's structure *generally*, the *Heckler* court misreads the Senate record to prioritize "confidentiality" over "parental encouragement" when these two priorities collide. *See* Heckler, at 712 f.2d at 660; 1977 Senate Report at 26. But the Senate Report does not go this far; instead, the Senate Report merely *compares* levels of patient confidentiality at standalone "family planning clinics" versus "comprehensive healthcare programs." *See* S. Rep. No. 102, 95th Cong., 1st Sess. 20–26 (1977).

Moreover, the legislative record from the 1975 and 1978 Title X reauthorization process strongly suggests Congress sought to involve parents in their children's family planning decisions as much as practicable. The 1975 Senate Report stated that "the Committee believes that unmarried teenagers, where feasible, should be encouraged to involve their family [sic] in their decision about use of contraceptives." S. Rep. No. 29, 94th Cong., 1st Sess. 55 (1975). The 1978 Senate Report stated that the reauthorization "is not intended to restrict or discourage the provision of voluntary

---

[20] *See BFP v. Resolution Trust Corp.*, 114 S. Ct. 1757, 1764–65 (1994).
[21] *See* Hawaiian Airlines, Inc. v. Norris, 114 S. Ct. 2239, 2243 (1994); *Cipollone v. Liggett Group, Inc.*, 112 S. Ct. 2608, 2617 (1992); *California v. ARC Am. Corp.*, 490 U.S. 93, 100–01 (1989).

family planning services to those adolescents who want them, but only to try to enhance communication within the family unit." S. Rep. No. 822, 95th Cong., 2d Sess. 40 (1978).

But the legislative record from 1981 is the *most* illuminating because that is the year Congress ratified the provision challenged in this case. *See* Pub L. No. 97–35 (1981). The House Report expressly stated that "unmarried teenagers, where feasible, should be encouraged to involve their families in their decision about use of contraceptives." H.R. Rep. No. 158, 97th Cong., 1st Sess. 82 (1981) (citation omitted). Using the whole-text canon of construction as a guide, it is further illuminating to note identical "family encouragement" provisions added throughout the omnibus bill to other programs related to adolescent sexual health. For example, creating a new Title XX program, Congress clarified:

> "(10)(A) prevention of adolescent sexual activity and adolescent values and close family ties, and since the family is the basic social unit in which the values and attitudes of adolescents concerning sexuality and pregnancy are formed, programs designed to deal with issues of sexuality and pregnancy will be successful to the extent that such programs encourage and sustain the role of the family in dealing with adolescent sexual activity and adolescent pregnancy;
>
> (B) Federal policy therefore should encourage the development of appropriate health, educational, and social services where such services are now lacking or inadequate, and the better coordination of existing services where they are available; and
>
> (C) services encouraged by the Federal Government should promote the involvement of parents with their adolescent children, and should emphasize the provision of support by other family members, religious and charitable organizations, voluntary associations, and other groups in the private sector in order to help adolescents and their families deal with complex issues of adolescent premarital sexual relations and the consequences of such relations

Pub L. No. 97–35 § 955(a)(10) (1981).

For the aforementioned reasons, the D.C. Circuit's interpretation of "congressional intent" in *Heckler* is exactly opposite of the "congressional intent" reflected in the full legislative record. Like the last block removed in a game of Jenga®, the negation of *Heckler* effectively negates the

*other* cases cited by Defendant on this point of law—all of which rely on *Heckler*. *See* Reply to MTD at 10-11 (collecting cases). Furthermore, even if the truth of the matter is more nuanced, exhaustion of the plain text, canons of statutory construction, and legislative history without a clear answer on the preemption question prevents the Court from concluding at the motion to dismiss stage that 42 U.S.C. § 300(a) preempts Texas Family Code § 151.001(a) by express, conflict, or field preemption.

### c. Whether Claim is Rendered "Default Implausible"

Because Plaintiff's statutory claim is not obviously preempted, the Court next must consider whether it is rendered "default implausible" by the presence of estoppel, legal immunity, laches, preclusion, improper joinder, failure to exhaust administrative remedies, or the statute of frauds. The only factor possible relevant here is "improper joinder," but the Court's analysis of intermediary party causality on pages 14–15 resolve the issue completely. Plaintiff's statutory claim is not default implausible under Fifth Circuit precedent.

### d. Checklist Approach

Because Plaintiff's statutory claim is neither "obviously preempted" nor "default implausible," the Court must presume plausibility under *Iqbal* and therefore deny a Rule 12(b)(6) motion if Plaintiff's complaint provides moderately detailed answers to the six interrogative pronouns—who, what, where, when, why, and how. All these pronouns are answered in the Complaint. *See* ECF No. 1 ¶¶ 3–6, at 2; *id.* ¶¶ 19–37, at 5–9. Accordingly, the Court must presume Plaintiff's statutory claim is plausible. Seeing no reason in the record to question this presumption, the Court hereby CONCLUDES Plaintiff has stated a plausible statutory claim upon which the Court can grant relief. Defendants motion to dismiss Plaintiff's claims under Texas Family Code § 151.001(a)(6) is DENIED.

### 2. Constitutional Claim: Parental Rights to "Care, Custody, Control"

Lastly, Defendants move to dismiss Plaintiff's substantive due process claim pursuant to Rule 12(b)(6). Unfurling their arguments crisply, Defendants insist the mere availability of "voluntary" family planning services under Title X does not deprive Plaintiff of the liberty to raise his daughters according to his religious beliefs about sexuality. *See* Motion at 23–25. Moreover, Defendants argue that Plaintiff has no "entitlement" that would permit him to conscript a national federal public program into his personal contraceptive crusade. *See id.* at 25–26.

Plaintiff rejects the limiting principle of "voluntariness." Plaintiff avers that the mere availability of voluntary family planning services *as the very harm* depriving him of his liberty insofar as it subverts the parental authority he is guaranteed under *Pierce*, *Meyer*, and *Troxel*. *See* Response to MTD at 17–18. Despite stated misgivings about the very category "substantive due process," Plaintiff argues that the right of parents to direct the upbringing of their children is a fundamental right "'deeply rooted in the Nation's history and tradition.'" Response to MTD 18 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997)). Relatedly, Plaintiff argues that any infringement of that right should be subjected to "strict scrutiny" and overridden only when necessary to advance a compelling government interest. *See id.* Plaintiff can discern no compelling government interest in distributing contraception to minors without their parents' consent. *See id.*

### a. Fifth Circuit Test

The Fifth Circuit has not yet addressed the precise intersection of the *Meyer-Pierce-Troxel* parental right and rights of minors to access contraceptives. Consequently, this Court therefore treats the substantive issue as one of first impression. Despite this novelty, the transsubstantive *Iqbal* plausibility criteria apply to the Court's adjudication of Defendants' motion to dismiss Plaintiff's constitutional claim under Rule 12(b)(6).

To survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. at 678. This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. A plaintiff is required to provide "more than labels and conclusions." *Twombly,* 550 U.S. at 555; *see also Johnson,* 706 Fed. App'x at 169 (5th Cir. 2017). "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true." *Twombly,* 550 U.S. at 555.

The Third and Sixth Circuit cases cited in Defendant's brief are *factually* compelling but *legally* irrelevant. In *Anspach v. City of Philadelphia, Dept. of Pub. Health*, the Third Circuit held: "Although [parents'] moral and religious sensibilities may have been offended by their daughter seeking out and using emergency contraception, her decision was voluntary." 503 F.3d 256, 268 (3d Cir. 2007). In *Doe v. Irwin*, the Sixth Circuit found no deprivation of the liberty interest of parents in the practice *of not notifying them* of their children's *voluntary* decisions to participate in family planning center activities. 615 F.2d 1162 (6th Cir. 1980).

Were those two cases the only ones on point or analogically similar to the instant case, Defendants' might prevail on this point of law. Yet the heavy weight Defendants lay upon the distinction between "voluntary" and "compulsory" programs in *Anspach* and *Irwin* cannot be reconciled with the Supreme Court's decision in *Troxel*.

In *Troxel*, the Supreme Court weighed constitutional "parental rights" against a Washington State statute authorizing judges to grant visitation rights whenever "visitation might serve the best interests of the child." *Troxel*, 530 U.S. at 60. Writing for the plurality, Justice O'Connor expressed concern that the statute authorized state courts to "disregard and

29

overturn *any* decision by a fit custodial parent concerning visitation whenever a third party affected by the decision files a visitation petition, based solely on the judge's determination of the child's best interests." *Id.* at 67. Hence, the Supreme Court was not fixated on the "mandatory" or "prohibitory" nature of the statute, but instead focused on the parent's fundamental right to make decisions for her child. *See also Littlefield v. Forney Indep. Sch. Dist.,* 268 F.3d 275 (5th Cir. 2001) "The Court [in *Troxel*] found the statute offensive to the parental rights of the mother in that it unconstitutionally interfered with the mother's right to *make decisions* concerning the upbringing of her child." *Id.* (emphasis added)**.** The Supreme Court's opinion in *M.L.B. v. S.L.J.* also cuts against Defendants for similar reasons. 519 U.S. 102 (1996).

*Anspach*, *Irwin*, *Troxel*, and *M.L.B.* are arguably reconcilable on one point: all four cases condemn the *usurpation* of fundamental parental rights—*i.e.*, the government physically or practically substitutes its judgment for the judgment of the parents. But this reconciliation ignores the plain text and import of *Troxel*. In *Troxel*, the Supreme Court did not fixate on a physical or practical act of usurpation, but instead focused on a Washing state statute that merely *disregarded* the "fundamental liberty interest of natural parents in the care, custody, and management of their child…." 530 U.S. at 65. Here, the Defendants have not *usurped* Plaintiff's parental rights but instead *disregarded* Plaintiff's parental rights under Texas Family Code § 151.001(a)(6). That is enough under *Troxel*.

The logic of two Supreme Court cases—*Troxel* and *M.L.B.*—suggests the distinction between "voluntary" and "mandatory" programs may be inapposite to Plaintiff's claims. Given the lack of Fifth Circuit precedent on point and the middling persuasiveness of *Anspach* and *Irwin*, the Court cannot prima facie dismiss the plausibility Plaintiff suffers an ongoing constitutional deprivation of his parental rights even though the voluntary Title X family planning grant program.

Since Plaintiff's constitutional rights claim is not obviously frivolous, the Court must determine whether success on the merits of that claim is rendered "default implausible" by the presence of estoppel, legal immunity, laches, preclusion, improper joinder, failure to exhaust administrative remedies, or the statute of frauds.[22] It is not. Lastly, the Court must check whether Plaintiff's Complaint answers with some degree of specificity the six interrogative pronouns — who, what, where, when, why, and how.[23]

All these pronouns are answered in the Complaint. *See* ECF No. 1 ¶¶ 3–6, at 2; *id.* ¶¶ 19–26, at 5–7; *id.* ¶¶ 33–37, at 8–9. Accordingly, the Court must presume Plaintiff's constitutional claim to be "plausible." Seeing no reason in the record to question this presumption, the Court CONCLUDES Plaintiff has stated a plausible constitutional claim upon which the Court can grant relief. Defendants motion to dismiss Plaintiff's constitutional claim with respect to his right to "direct the upbringing" of his daughters is DENIED.

In summary, the Court concludes that Plaintiff has proven all the *Lujan* factors of constitutional standing for both his statutory claim and his constitutional claim and that no prudential standing considerations override that constitutional standing. The Court therefore DENIES Defendants' motion to dismiss the Complaint (ECF No. 1) under Rule 12(b)(1) of the Federal Rules of Civil Procedure. The Court also concludes Plaintiff has pleaded plausible statutory and constitutional claims. The Court therefore DENIES Defendants' motion to dismiss the Complaint (ECF No. 1) under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

---

[22] *See Loupe v. O'Bannon*, 824 F.3d 534, 539 (5th Cir. 2016); *Davidson v. Georgia-Pacific, L.L.C.*, 819 F.3d 758, 765 (5th Cir. 2016); *Miller v. BAC Home Loans Servicing, L.P.*, 726 F.3d 717, 726 (5th Cir. 2013); *Backe v. LeBlanc*, 691 F.3d 645, 649 (5th Cir. 2012); *City of Clinton, Ark. v. Pilgrim's Pride Corp.*, 632 F.3d 148, 155 (5th Cir. 2010).

[23] *See, e.g.*, 19 ARISTOTLE, *Nicomachean Ethics*, *in* ARISTOTLE IN 23 VOLUMES 1111a17 (H. Rackham trans. 1934) (350 B.C.) ("Perhaps then it will be as well to specify the nature and number of these circumstances. They are (1) the agent, (2) the act, (3) the thing that is affected by or is the sphere of the act; and sometimes also (4) the instrument, for instance, a tool with which the act is done, (5) the effect, for instance, saving a man's life, and (6) the manner, for instance, gently or violently."); Frank Luther Mott, *Trends in Newspaper Content,* 219 ANNALS OF THE AMERICAN ACADEMY OF POLITICAL AND SOCIAL SCIENCE 60 (1942).

**SO ORDERED**.

September 24, 2020.

_____
MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE