


IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| ALEXANDER R. DEANDA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2:20-CV-092-Z |
| | § | |
| XAVIER BECERRA, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**OPINION AND ORDER**

Before the Court are parties' competing motions for summary judgment. Plaintiff Alexander R. Deanda filed his Motion for Summary Judgment ("Motion") (ECF No. 50) on July 25, 2022. Defendants filed their Cross-Motion for Summary Judgment ("Cross-Motion") (ECF No. 52) on August 19, 2022. Having considered the motions, pleadings, and relevant law, the Court **GRANTS** Plaintiff's Motion and renders summary judgment in Plaintiff's favor on all claims. The Court **DENIES** Defendants' Cross-Motion.

**BACKGROUND**

Congress enacted Title X of the Public Health Service ("PHS") Act, 42 U.S.C. §§ 300 *et seq.*, to "mak[e] comprehensive voluntary family planning services readily available to all persons desiring such services." Family Planning Services and Population Research Act of 1970, Pub. L. No. 91-572, § 2(1), 84 Stat. 1504 (1970). The PHS authorizes the U.S. Department of Health and Human Services ("HHS") to "make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents)." 42 U.S.C. § 300(a). In 1981, Congress amended the statute to include the current

requirement that, "[t]o the extent practical," participating entities "shall encourage family participation in projects assisted under this subsection." *Id.*; *see also* Pub. L. No. 97-35, § 931(b)(1), 95 Stat. 357 (1981). HHS regulations now provide that "Title X projects may not require consent of parents or guardians for the provision of services to minors[.]" 42 C.F.R. § 59.10(b); *see also* 86 Fed. Reg. 56,144, 56,166 (Oct. 7, 2021).

Plaintiff is a Christian who is "raising each of [his] daughters in accordance with Christian teaching on matters of sexuality, which requires unmarried children to practice abstinence and refrain from sexual intercourse until marriage." ECF No. 51-1 at 1. Texas Family Code § 151.001(a)(6) protects Plaintiff's free exercise of religion in this regard because it protects "the right to consent to the child's . . . medical and dental care, and psychiatric, psychological, and surgical treatment." Texas law also provides Plaintiff standing to sue for a violation of Section 151.001(a)(6). *See* TEX. FAM. CODE § 102.003(a)(1).

Plaintiff alleges Defendants' administration of Title X impedes this statutory right and his parental rights under the U.S. Constitution because Defendants: (1) fail to monitor grantees to ensure compliance; and (2) continue to fund grantees that violate Section 151.001(a)(6). ECF No. 1 at 5–7. Arguing Title X does not preempt "parental consent" laws, Plaintiff alleges his injures include, but are not limited to: (1) loss of his statutory rights under Section 151.001(a)(6); (2) the subversion of his authority as a parent; (3) loss of assurance that his children will be unable to access prescription contraception or other family planning services that facilitate sexual promiscuity and pre-marital sex; and (4) weakening of his ability to raise his children under the teachings of his Christian faith. ECF No. 51-1 at 2. Plaintiff asks this Court to declare that Section 151.001(a)(6) applies to all Title X grantees in Texas. *See* ECF No. 1 at 3–5. Plaintiff

further asks the Court to enjoin Defendants from funding any Texas-based Title X grantee that violates Section 151.001(a)(6). *Id.* at 7.

**LEGAL STANDARD**

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if its existence or non-existence "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "[T]he substantive law will identify which facts are material." *Id.* at 248. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "On cross-motions for summary judgment, [the Court] review[s] each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Texas v. Rettig*, 987 F.3d 518, 526 (5th Cir. 2021) (quoting *Amerisure Ins. Co. v. Navigators Ins. Co.*, 611 F.3d 299, 304 (5th Cir. 2010)).

When reviewing summary-judgment evidence, the court must resolve all reasonable doubts and draw all reasonable inferences in the light most favorable to the non-movant. *Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). A court cannot make a credibility determination when considering conflicting evidence or competing inferences. *Anderson*, 477 U.S. at 255. If some evidence supports a disputed allegation, so that "reasonable minds could differ as to the import of the evidence," the court must deny the motion. *Id.* at 250.

**ANALYSIS**

The Court will address parties' standing and statute-of-limitations arguments before moving to their merits arguments.

### A. Plaintiff Has Standing

The judicial power of federal courts is limited to certain "Cases" and "Controversies." U.S. CONST. art. III, § 2. The case-or-controversy requirement requires a plaintiff to establish he has standing to sue. *See Gill v. Whitford*, 138 S. Ct. 1916, 1923 (2018); *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013) ("Every party that comes before a federal court must establish that it has standing to pursue its claims."). Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

To have standing, the party invoking federal jurisdiction must establish he suffered: (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent"; (2) an injury that is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) an injury that is "likely" rather than "speculative[ly]" to be "redressed by a favorable decision." *Id.* at 560–61. "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021).

1. Plaintiff satisfies the first *Lujan* factor.

The first *Lujan* factor considers whether a plaintiff has sustained an "injury in fact" that is "concrete and particularized" and "actual or imminent." *Lujan*, 504 U.S. at 560. A "concrete" injury must be "de facto." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). That is, it must "actually exist" and be "real" rather than "abstract." *Id.* A "particularized" injury "must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1.

One who seeks injunctive or declaratory relief must show an injury with "continuing, present adverse effects" or a "substantial likelihood that he will suffer injury in the future." *Bauer*

*v. Texas*, 341 F.3d 352, 358 (5th Cir. 2003); *see also TransUnion*, 141 S. Ct. at 2210 ("[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial."). "[E]ven a small probability of injury is sufficient to create a case or controversy — to take a suit out of the category of the hypothetical — provided of course that the relief sought would, if granted, reduce the probability." *Village of Elk Grove Village v. Evans*, 997 F.2d 328, 329 (7th Cir. 1993); *see also, e.g.*, *Massachusetts v. EPA*, 549 U.S. 498, 525 n.23 (2007); *Mo. Coal. for Env't v. FERC*, 544 F.3d 955, 957 (8th Cir. 2008); *Stewart v. Blackwell*, 444 F.3d 843, 855 (6th Cir. 2006), *vacated and superseded on other grounds*, 473 F.3d 692 (6th Cir. 2007); *Nat. Res. Def. Council v. EPA*, 464 F.3d 1, 7 (D.C. Cir. 2006); *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 860 (9th Cir. 2005); *Friends of Marolt Park v. U.S. Dep't of Transp.*, 382 F.3d 1088, 1095 (10th Cir. 2004).

A court should assess whether the alleged injury to the plaintiff has a "close relationship" to a harm "traditionally" recognized as providing a basis for a lawsuit in American courts. *TransUnion*, 141 S. Ct. at 2204. "[A] plaintiff doesn't need to demonstrate that the level of harm he has suffered would be actionable under a similar, common-law cause of action. But he does need to show that the type of harm he's suffered is similar in kind to a type of harm that the common law has recognized as actionable." *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 822 (5th Cir. 2022); *see also Campaign Legal Ctr. v. Scott*, No. 22-50692, 2022 WL 4546109, at *8 (5th Cir. Sept. 16, 2022) (Ho., J, concurring) (stating evidence of injury required by *TransUnion* is not burdensome).

a. *Plaintiff suffers from an injury in fact.*

"[T]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982) (internal marks omitted). When "a plaintiff's claim of injury in fact depends on legal rights conferred by statute, it is the particular statute and the rights it conveys that guide the standing determination." *Wendt v. 24 Hour Fitness USA, Inc.*, 821 F.3d 547, 552 (5th Cir. 2016) (quoting *Donoghue v. Bulldog Inv'rs Gen. P'ship*, 696 F.3d 170, 178 (2d Cir. 2012)). "Essentially, the standing question in such cases is whether the . . . statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Id.* (alteration in original). "Hence, the 'injury in fact' analysis for purposes of Article III is directly linked to the question of whether the plaintiff 'has suffered a cognizable statutory injury under the' statute in question." *Id.* (quoting *Robey v. Shapiro, Marianos & Cejda, L.L.C.*, 434 F.3d 1208, 1212 (10th Cir. 2006)). "Although Article III standing is a question of federal law, state law may create the asserted legal interest." *Utah ex rel. Div. of Forestry, Fire & State Lands v. United States*, 528 F.3d 712, 721 (10th Cir. 2008); *see also Diamond v. Charles*, 476 U.S. 54, 65 n.17 (1986); *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 & n.3 (1973); *Sierra Club v. Morton*, 405 U.S. 727, 732 (1972).

Texas law confers Plaintiff the right to consent to his children's medical care and general standing to file suit for a violation of that right. *See* TEX. FAM. CODE §§ 102.003(a)(1) ("An original suit may be filed at any time by . . . a parent of the child . . . ."), 151.001 (A Texas parent may file a lawsuit for violating his "right to consent to . . . medical and dental care."). Plaintiff alleges the loss of his state-law right to consent to the medical treatment of his minor

children constitutes an injury in fact that is concrete and particularized as well as actual and imminent. *See* ECF No. 51 at 10–11. The Court agrees that Plaintiff suffers an injury in fact.[1]

Plaintiff clearly suffers an injury in fact when compared to a hypothetical given in *TransUnion*. In *TransUnion*, the Supreme Court provided the following hypothetical: "Suppose first that a Maine citizen's land is polluted by a nearby factory." 141 S. Ct. at 2205. The citizen "sues the company, alleging that it violated a federal environmental law and damaged her property." *Id.* Then "[s]uppose also that a second plaintiff in Hawaii files a federal lawsuit alleging that the same company in Maine violated that same environmental law by polluting land in Maine." *Id.* The violation alleged "did not personally harm the plaintiff in Hawaii." *Id.* "Even if Congress affords both hypothetical plaintiffs a cause of action . . . to sue over the defendant's legal violation, Article III standing doctrine sharply distinguishes between those two scenarios." *Id.* at 2206. Although the first plaintiff possesses standing to sue "because the plaintiff has suffered concrete harm to her property," the second plaintiff lacks standing "because that plaintiff has not suffered any physical, monetary, or cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* Plaintiff here is like the first plaintiff in the hypothetical. Plaintiff's injury in fact for which this Court has the power to remedy is the loss of his state-law parental-consent rights. Plaintiff is unlike the second plaintiff in the hypothetical. Somebody, such as a third party, suing for a violation of Plaintiff's state-law parental rights would be like the second plaintiff.

[1] When a father is told that his state-law right to consent to his child's medical treatment has been taken away or transferred to someone else, he need not wait for an actual medical situation to arise before suing to recover his right to consent. The violation occurs when the rights were taken away in the first instance, not when one acts contrary to the father's right to consent — a right which he would lack. And the violation continues to occur while the father lacks the parental consent to which he is entitled.

Aside from his state-law harm, Plaintiff suffers from harms specified by the U.S. Constitution. Standing may exist for such harm. *See id.* at 2204 (Traditional harms "may also include harms specified by the Constitution itself." (citing *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009); *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993)).[2] The First Amendment prohibits infringement of one's right to freely exercise his religion. *See* U.S. CONST. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."); *Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972) (holding Free Exercise Clause protects "the traditional interest of parents with respect to the religious upbringing of their children"). And the Fourteenth Amendment prohibits the abridgment of parental rights. *See* U.S. CONST. amend. XIV; *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) ("Choices about . . . the upbringing of children are among associational rights this Court has ranked as 'of basic importance in our society,' rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." (quoting *Boddie v. Connecticut*, 401 U.S. 371, 376 (1971)). Plaintiff has thus shown "the type of harm he's suffered is similar in kind to a type of harm that the common law has recognized as actionable." *Perez*, 45 F.4th at 822.

b. *Plaintiff adequately alleges an injury in fact on his substantive due-process claim.*

Plaintiff alleges he suffers from three cognizable injuries under substantive due-process jurisprudence: (1) immediate, present-day injury by subverting Plaintiff's authority as a parent from Defendants' administration of the Title X program; (2) present-day injury from the loss of

[2] By citing *Summum* approvingly, *TransUnion* indicates there was sufficient *intangible* concrete harm when the city denied a religious organization's proposal for a religious monument in which a Ten Commandments monument already stood. *See Summum*, 555 U.S. at 465. This is true even though the respondent lost on the merits of its Free Speech claim. *Id.* at 481; *see also Spokeo*, 578 U.S. at 340 ("Although tangible injuries are perhaps easier to recognize, . . . intangible injuries can nevertheless be concrete."). Thus, it would be nonsensical to hold that an organization suffers concrete harm when a proposal for a monument is denied but a father has not suffered concrete harm when he is deprived of a statutory right to consent to his children's medical treatment.

assurance that his children will be unable to access prescription contraction or other family-planning services; and (3) present-day injury from the increased risk of his children accessing birth control without his knowledge or consent. *See* ECF No. 51 at 14–16.

In support of his first two arguments, Plaintiff likens this case to two cases titled *Parents United for Better Schools v. School District of Philadelphia Board of Education. Id.* These two cases were brought by parents and an organization consisting of parents that sued to stop a condom-distribution program at public high schools. In the first of these cases, the Pennsylvania Commonwealth Court determined the plaintiffs — parents of minor children — possessed standing because they: (1) identified a substantial interest — *i.e.*, their prior express parental consent to medical treatment; (2) that interest was directly affected by the defendant's action; and (3) the consequences of that action affecting the substantial interest were immediate. *See Parents United for Better Schs., Inc. v. Sch. Dist. of Phila. Bd. of Educ.*, 646 A.2d 689, 691 (Pa. Commw. Ct. 1994) ("*PUBS I*"). Likewise, the Third Circuit later permitted the parents to challenge the condom-distribution program on the ground that the program subverted parental authority. *See generally Parents United for Better Schs., Inc. v. Sch. Dist. of Phila. Bd. of Educ.*, 148 F.3d 260 (3d Cir. 1998) ("*PUBS II*").

Defendants argue this case is distinguishable from the *PUBS* cases because the state court required the plaintiff organization to show "at least one member who has or will suffer a direct, immediate, and substantial injury to an interest as a result of a challenged action." ECF No. 53 at 24 (quoting *PUBS I*, 646 A.2d at 692)). The plaintiff organization could make this showing because many of its members were parents of children who attended schools where the challenged policy had been implemented. *See PUBS I*, 646 A.2d at 692. This burden — Defendants argue — is precisely the burden that Plaintiff must (and cannot) sustain. ECF No. 53 at 25.

Here, the combined *PUBS I* and *II* cases *support* Plaintiff's standing. First, nothing in the state court's analysis turned on a finding that any of the parents' children obtained or used condoms without parental consent. Second, the state court found the plaintiff organization had standing *even though the parents could opt out* of the condom-distribution program. *See PUBS II*, 148 F.3d at 264–65. This is because consent is assumed if a parent does not opt out. *PUBS I*, 646 A.2d at 691. And third, "[t]he principle that parental consent must be secured before medical treatment provided is time honored and has been recognized by both the courts and the legislature." *Id.* Because Plaintiff cannot opt out of his daughters' ability to access contraception by Defendants and parental consent to access contraception is enumerated by statute, the *PUBS* cases support Plaintiff's standing.

Plaintiff also argues Defendant's actions inflict present-day injury by increasing the risk that Plaintiff's children might access birth control without his knowledge or consent. ECF No. 51 at 16. In *Massachusetts v. EPA*, the U.S. Supreme Court stated, "even a small probability of injury is sufficient to create a case or controversy — to take a suit out of the category of the hypothetical — provided of course that the relief sought would, if granted, reduce the probability." 549 U.S. at 525 n.23 (internal marks omitted). Defendants attempt to distinguish this case from *Massachusetts* by noting Plaintiff asserts a substantive due-process right, rather than a procedural due-process right. ECF No. 53 at 25–26. But the cases Plaintiff cites in support seldom turn on any sort of distinction between procedural and non-procedural rights. *See* ECF No. 51 at 16–17 (collecting cases); *see also, e.g.*, *Sutton v. St. Jude Med. S.C., Inc.*, 419 F.3d 568, 570 (6th Cir. 2005) (finding plaintiff has standing to bring negligence claims "on behalf of a class of as-of-yet uninjured device implantees" due to increased disease risk); *Perez*, 45 F.4th at 824 ("For Article III purposes, *Spokeo* never distinguished between substantive and procedural statutory rights.").

Just as one "accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy," one can also suffer a probabilistic injury in fact if the injury is concrete, particularized, imminent, and has some geographic and temporal nexus to the plaintiff. *Lujan*, 504 U.S. at 572 n.7. Although the causation and redressability components of standing are harder to establish when one is not directly subject to the challenged governmental action, standing jurisprudence does suggest that the injury in fact prong becomes tougher to establish in these types of cases.

Defendants' administration of Title X grants in Potter and Randall Counties satisfies the standard for "increased risk." ECF No. 23 at 20. Title X sub-recipients in Region VI, a region that includes the State of Texas, dispensed contraception to over 35,000 girls under the age of eighteen in 2021. *See* HHS OFFICE OF POPULATION AFFAIRS, 2021 Title X Family Planning Annual Report 12, Ex. 4 (Sept. 2021). All family-planning clinics in Texas that do *not* receive Title X funds must obtain parental consent to dispense contraception to a minor. *See* TEX. FAM. CODE § 151.001(a)(6). But Defendants issued written guidance instructing grant recipients that they may *not* require parental consent. *See* OPA Program Policy Notice 2014-01 (June 5, 2014). If even one Title X sub-recipient near Amarillo follows Defendants' guidance when interacting with a minor, that action increases Plaintiff's probability of harm.

Given the number of Title X grantees and sub-recipients in Region VI and the number of minor girls to whom they dispense contraception, the odds of this net "increased risk" occurring asymptotically approach 100% — thereby making Plaintiff's injury "imminent." Title X clinics are open most days and, therefore, they post an ongoing, continuous, and imminent risk to Plaintiff that is not part of a "chain" of speculative improbabilities. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411–14 (2013); *City of Los Angeles v. Lyons*, 461 U.S. 95, 102–09 (1983). Such risk

does not rely on excessive "guesswork." *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 537 (5th Cir. 2019). Because Plaintiff alleges harm that is "traditionally recognized as providing a basis for a lawsuit in American courts," Plaintiff sufficiently alleges an injury in fact. 141 S. Ct. at 2206.

2. Plaintiff's injuries are fairly traceable to Defendant's conduct and likely to be redressed by the requested relief.

"[A] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 (2014); *see also Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976) ("In other words, the 'case or controversy' limitation of Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court."). The "fairly traceable" and "redressability" components of the standing inquiry were initially articulated as "two facets of a single causation requirement." *Allen*, 468 U.S. at 753 n.19 (quoting CHARLES ALLEN WRIGHT, LAW OF FEDERAL COURTS § 13 (4th ed. 1983)). "To the extent there is a difference, it is that the former examines the causal connection between the assertedly unlawful conduct and the alleged injury, whereas the latter examines the causal connection between the alleged injury and the judicial relief requested." *Id.*

"[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury." *Massachusetts*, 549 U.S. at 525 (quoting *Larson v. Valente*, 456 U.S. 228, 244 n.15 (1982)). And redressability need not be certain. A "substantial likelihood" of the requested relief redressing the alleged injury is enough to pass muster in standing analysis. *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 74–75 (1978). Redressability is

satisfied even if relief must filter downstream through third parties uncertain to comply with the result, provided the relief would either: (1) remove an obstacle for a nonparty to act in a way favorable to the plaintiff; or (2) influence a nonparty to act in such a way. *See, e.g.*, *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565–66 (2019); *Larson*, 456 U.S. at 242–44; *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 396–98 (5th Cir. 2015).

Defendants interpret Title X to preempt state laws requiring a medical practitioner to obtain parental consent before providing medical care to minor children. *See* ECF No. 24 at 4. Relevant HHS regulations provide "Title X projects may not require consent of parents or guardians for the provision of services to minors." *See* OPA Program Policy Notice 2014-01 (June 5, 2014). Furthermore, Defendants instruct sub-recipients that Title X project staff may not "notify a parent or guardian before or after a minor has requested and/or received Title X family planning services." 42 C.F.R. § 59.10(b).

Plaintiff's alleged injuries are traceable to Defendants' behavior and can be redressed by a declaratory judgment finding Defendants' actions unlawful or injunctive relief prohibiting Defendants from enforcing Title X in contravention of Plaintiff's parental rights. It is probable Defendants' continued funding of non-compliant grantees makes it more likely that grantees and sub-recipients will not comply with Section 151.001(a)(6). Conversely, if Defendants cease funding non-compliant grantees, it is substantially likely the clinics would act in a way that reduces the odds of Plaintiff's alleged future injury.[3] And it is well understood that in Texas, minors must have parental consent for birth control unless they go to a Title X clinic.[4] Because Plaintiff's injury

[3] Title X sub-recipients in Region VI — which includes Texas — depend on Defendants' grants for roughly fifteen percent of their total revenue. *See* HHS Office of Population Affairs, 2021 Title X Family Planning Annual Report 58, Ex. 32.

[4] *See, e.g.*, Texas Department of Health and Human Services, *Responsibilities for Treatment of Minors within the Texas Family Planning Program and Healthy Texas Women Program* at 1 ("In accordance with the Texas Family Code, Healthy Texas Women (HTW) and Family Planning Program (FPP) services must be delivered in a manner

in fact is fairly traceable to Defendants' actions and likely to be redressed by a favorable decision of this Court, Plaintiff has standing.[5]

**B. The Statute of Limitations Does Not Bar Plaintiff's Claims**

Defendants argue 28 U.S.C. § 2401(a) bars Plaintiff's claims. ECF No. 53 at 16. Under Section 2401(a), "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a). "Section 2401(a) generally 'applies to all civil actions whether legal, equitable, or mixed.'" *Felter v. Kempthorne*, 473 F.3d 1255, 1259 (D.C. Cir. 2007) (quoting *Kendall v. Army Bd. for Corr. of Military Records*, 996 F.2d 362, 365 (D.C. Cir. 1993)). "The accrual of a cause of action means the right to institute and maintain a suit, and whenever one person may sue another a cause of action has accrued." *In re Swift*, 129 F.3d 792, 795 (5th Cir. 1997); *see also Helton v. Clements*, 832 F.2d 332, 334–35 (5th Cir. 1987) ("[A] cause of action accrues the moment the plaintiff knows or has reason to know of the injury that is the basis of his complaint.").

Defendants insist Plaintiff "must show some direct, final agency action involving the particular plaintiff within six years of filing suit" to sustain this suit. ECF No. 53 at 17 (quoting *Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1287 (5th Cir. 1997)). Generally, "on a facial challenge to a regulation, the limitations period begins to run when the

---

that complies with parental consent requirements for minors."); *Pregnant and Parenting Minors and Health Care*, TEXASLAWHELP (June 24, 2022) ("If you are a minor in Texas, you must have parental consent for birth control, unless you go to a Title X clinic. Title X clinics are available to any person of any age, but they are the only clinics in Texas where minors can get birth control without permission from their parents.").

[5] The Court has discretion to override that standing for prudential reasons — *e.g.*, the rules against litigating: (1) "generalized grievances"; (2) the "rights of a third party"; or (3) outside the "zone of interest." *See, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 162–66 (1997); *Allen*, 468 U.S. at 751; *Singleton v. Wulff*, 428 U.S. 106, 114 (1976). But this case does not implicate those categories. The Court therefore declines to invoke prudential reasons to void Plaintiff's standing on his claims. *See Cohens v. Virginia*, 6 Wheat. 264, 404 (1821) ("We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution.").

agency publishes the regulation in the Federal Register." *Dunn-McCampbell Royalty Int.*, 112 F.3d at 1287. But Plaintiff does not bring a facial challenge to an agency rule. ECF No. 51 at 9. Plaintiff only asks for a declaration of his rights under 28 U.S.C. § 2201, along with an injunction to ensure those rights are observed. *Id.*

Because Plaintiff only seeks prospective relief against the continued enforcement of unlawful statutes, rules, or policies, Section 2401(a) is inapplicable to his claims. *See, e.g.*, *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968). "When, as here, the challenged action is ongoing, the cause of action continues to accrue along with the allegedly unconstitutional conduct that gives rise to the plaintiff's injury and cannot be insulated by a statute of limitations." *Kelley v. Azar*, No. 4:20-CV-283-O, 2021 WL 4025804, at *8 (N.D. Tex. Feb. 25, 2021); *see also, e.g., McGregor v. La. State Univ. Bd. of Supervisors*, 3 F.3d 850, 867 (5th Cir. 1993). In other words, Plaintiff's claims accrue continually as Defendants persist in enforcing unlawful statutes or agency rules in a manner that affects Plaintiff. *See, e.g.*, *Flynt v. Shimazu*, 940 F.3d 457, 462 (9th Cir. 2019) ("When the continued enforcement of a statute inflicts a continuing or repeated harm, a new claim arises (and a new limitations period commences) with each new injury."); *Kuhnle Brothers, Inc. v. County of Geauga*, 103 F.3d 516, 522 (6th Cir. 1997); *Va. Hosp. Ass'n v. Baliles*, 868 F.2d 653, 663 (4th Cir. 1989).[6]

---

[6] Staleness can bar claims in some cases. But "[w]here the challenged violation is a continuing one, the staleness concern disappears." *McGregor*, 3 F.3d at 867 (quoting *Havens Realty*, 455 U.S. at 380). There is no staleness concern in this litigation. Although Defendants correctly note that their administration of Title X is "pursuant to decades-old laws," Plaintiff's claims are not time-barred merely because his daughters were born in the wrong decade. ECF No. 53 at 18. Unlike *McGregor*, where there was only a "single violation followed by continuing consequences," Plaintiff alleges "an *ongoing* violation of his constitutional and statutory rights." 3 F.3d at 867; *see also* ECF No. 51 at 7.

### C. The Title X Statute Does Not Preempt Section 151.001(a)(6)

Federal law preempts state law when: "(1) Congress expressly preempts state law; (2) [c]ongressional intent to preempt may be inferred from the existence of a pervasive federal regulatory scheme; or (3) state law conflicts with federal law or its purposes." *Frank v. Delta Airlines, Inc.*, 314 F.3d 195, 197 (5th Cir. 2002). These three forms of preemption are commonly known as: (1) express preemption; (2) field preemption; and (3) conflict preemption. "Pre-emption of state law by federal statute or regulation is not favored 'in the absence of persuasive reasons — either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained.'" *Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317 (1981) (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142 (1963)). Courts presume "against pre-emption in areas of traditional state regulation such as family law." *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 151 (2001).

Preemptive effect is "given only to those federal standards and policies that are set forth in, or necessarily follow from, the statutory text that was produced through the constitutionally required bicameral and presentment procedures." *Wyeth v. Levine*, 555 U.S. 555, 586 (2009) (Thomas, J., concurring). "[U]nenacted approvals, beliefs, and desires are not laws. Without a text that can, in light of those statements, plausibly be interpreted as *prescribing* federal pre-emption it is impossible" to find that state law is displaced. *P.R. Dep't of Consumer Affs. v. Isla Petrol. Corp.*, 485 U.S. 495, 501 (1988); *see also Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992) ("The question . . . is not what Congress 'would have wanted' but what Congress enacted . . . ."). This is because "a sweeping approach to pre-emption leads to the illegitimate — and thus, unconstitutional — invalidation of state laws." *Wyeth*, 555 U.S. at 604 (Thomas, J., concurring).

The relevant part of Title X reads:

> The Secretary is authorized to make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents). To the extent practical, entities which receive grants or contracts under this subsection shall encourage family participation in projects assisted under this subsection.

42. U.S.C. § 300(a). The issue in this case is not whether 42 U.S.C. § 300(a) can or should be interpreted to independently require Title X participants to obtain parental consent before dispensing birth control or prescription contraception to minors. *See generally New York v. Heckler*, 719 F.2d 1191 (2d Cir. 1983) (holding Section 300(a) does not require Title X participants to obtain parental consent); *Planned Parenthood Fed'n of Am., Inc. v. Heckler*, 712 F.2d 650 (D.C. Cir. 1983) (same). Rather, the issue is whether Section 300(a) preempts a state-law parental-consent requirement.

1. <u>Neither express preemption nor field preemption apply here.</u>

Section 300(a)'s text does not overcome the presumption against preemption. Section 300(a) contains no express-preemption clause. The absence of such a provision is "powerful evidence" that Title X does not preempt state parental-consent laws. *Wyeth*, 555 U.S. at 575. Likewise, the scheme of the federal regulation is not "so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it," thereby creating field preemption. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

2. <u>Conflict preemption does not apply here.</u>

Conflict preemption exists when "compliance with both state and federal law is impossible" or when a "state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Federal law prevails in either

scenario. In assessing either scenario, however, courts "are reluctant to infer pre-emption." *Building & Construction Trades Council of the Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 224 (1993).

"Evidence of pre-emptive purpose is sought in the text and structure of the statute at issue." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). A court should not evaluate conflict preemption "in a vacuum," without affording "meaning to an enacted statutory text." *Isla Petrol.*, 485 U.S. at 501; CALEB NELSON, STATUTORY INTERPRETATION 865 (2011) ("At a minimum, *Isla Petroleum* denies that questions about the preemptive effect of a federal statute are *automatically* within the statute's domain, so that courts can fairly disregard *any* aspect of state law that they imagine members of the enacting Congress would have wanted to displace."). Text should be "interpreted in its statutory and historical context and with appreciation for its importance to the [statute] as a whole." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001). "[C]ontext always includes evident purpose." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 63 (2012). And "evident purpose always includes effectiveness." *Id.*

Defendants argue Title X "plainly leaves no room for states to impose parental consent requirements." ECF No. 53 at 27. Title X grantees must only "encourage family participation" in decision-making "to the extent practical." 42 U.S.C. § 300(a); 42 C.F.R. § 59.10(b). Accordingly, Defendants argue, "[r]equiring parental consent would render the 'to the extent practical' language meaningless and would contradict the plain meaning of the words 'encourage' and 'participation.'" ECF No. 53 at 27; *see also County of St. Charles v. Mo. Fam. Health Council*, 107 F.3d 682, 684–85 (8th Cir. 1997); *Jane Does 1 through 4 v. State of Utah Dep't of Health*, 776 F.2d 253, 255–56 (10th Cir. 1985); *Heckler*, 712 F.2d at 664 n.57; *Planned Parenthood Ass'n of Utah v. Matheson*,

582 F. Supp. 1001, 1006 (D. Utah 1983); *Doe v. Pickett*, 480 F. Supp. 1218, 1220 (S.D. W.Va. 1979).

Plaintiff argues Section 300(a)'s requirement to "encourage family participation" only "to the extent practical" establishes a federally mandated minimum — a floor — for parental involvement. ECF No. 51 at 20. Plaintiff does not argue Section 300(a) imposes parental-consent or parental-notification requirements.[7] He only argues "there is nothing in federal law that purports to *prohibit* a Title X entity from obtaining parental consent." *Id.* Therefore, there cannot be a "conflict" between the requirements of Section 300(a) and Section 151.001(a)(6). *See id.* at 20, 21 ("There is *absolutely nothing* in the text of 42 U.S.C. § 300(a) that purports to preempt or override state or federal laws that require more extensive parental involvement, and there is nothing in 42 U.S.C. § 300(a) that purports to exempt Title X projects from those laws."). Moreover, Plaintiff argues Title X does not set out in clear and ambiguous language "that participating States are forbidden to enforce their parental-involvement laws against Title X projects." *Id.* at 22.

Just as Section 300(a) does not preempt Section 151.001(a)(6) by express or field preemption, Section 300(a) does not preempt Section 151.001(a)(6) by conflict preemption. Section 151.001(a)(6) does not make it impossible to comply "with both state and federal law." *ARC Am. Corp.*, 490 U.S. at 100 (quoting *Hines*, 312 U.S. at 67). To the contrary, the Title X grantee shall, "[t]o the extent practical, . . . encourage family participation" in relevant decision-making, as required by federal law. 42 U.S.C. § 300(a). And under Texas law, the grantee must obtain parental consent. It is therefore *not* impossible to comply with both federal and Texas law: the grantee must encourage (under federal law) family participation and obtain (under Texas law) parental consent. Obtaining parental consent does not prohibit the grantee from encouraging

---

[7] Plaintiff, however, "acknowledges that it is *possible* to construe 42 U.S.C. § 300(a) that way." ECF No. 51 at 20.

family participation.[8] *See, e.g.*, *Wyeth*, 555 U.S. at 568–71 (finding it possible to comply with FDA's warning-label requirements and strong warning-label requirements implemented by state judgment).

Likewise, Section 151.001(a)(6) does not stand as an obstacle to the accomplishment of Section 300(a)'s aims. Section 151.001(a)(6) is not "firmly rooted in policies very much related to, and to a large extent directly contrary to" Section 300(a). *Felder v. Casey*, 487 U.S. 131, 145 (1988). A law *not* "firmly rooted in policies very much related to, and to a large extent directly contrary to" Section 300(a)'s aims would *discourage* or *prohibit* parental involvement. The Texas law does not discourage or prohibit parental involvement. The Texas law instead requires parental involvement — which is perfectly consistent with encouraging parental involvement.

Although other courts have held Title X "preempts" state-imposed parental-notification and consent requirements, the Court finds those authorities unpersuasive. *See, e.g.*, *Milner v. Dep't of Navy*, 562 U.S. 562, 576 (2011) ("[W]e have no warrant to ignore clear statutory language on the ground that other courts have done so."). None of those authorities acknowledge the presumption against preemption.[9] None explain how Section 300(a) might preempt Section 151.001(a)(6). And none consider that the Title X statute only establishes a floor (rather

---

[8] It is also for this reason Defendant's reliance on the Fifth Circuit's decision in *Planned Parenthood of Hous. & Se. Tex. v. Sanchez*, 403 F.3d 324, 327 (5th Cir. 2005) is unavailing. *See* ECF No. 53 at 28. Section 151.001(a)(6) cannot be read to impose inconsistent eligibility requirements on Title X because it is a generally applicable law and predates Title X's amendment to include "services for adolescents." *See* S.B. No. 168, 63rd Leg. R.S., 1973 Tex. Gen. Laws 1411; Pub. L. No. 95-613, § 1(a)(1), 92 Stat. 3093 (1978). But even if Section 151.006(a)(6) were construed to impose eligibility requirements on the Title X program, *Sanchez* states: "The mere fact that a state program imposes an additional 'modest impediment' to eligibility for federal funds does not provide a sufficient basis for preemption." 403 F.3d at 336–37. Furthermore, *Sanchez* requires the Court to "choose the interpretation of [Section 151.001(a)(6)] that has a chance of avoiding federal preemption." *Id.* at 342. "[S]uch a construction is reasonable and readily apparent" because Section 151.001(a)(6) can be read as simply establishing parental involvement for the Title X statute, which encourages the same. *Id.* at 41.

[9] *See Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 907 (2000) (Stevens, J., dissenting) (The presumption "serves as a limiting principle that prevents federal judges from running amok with our potentially boundless (and perhaps inadequately considered) doctrine of implied conflict pre-emption based on frustration of purposes.").

than a ceiling) for parental involvement. These non-precedential opinions only ruminate on Congress's "purposes" and "intentions," citing committee reports along the way.[10] They do not rely on actual law of any sort. In any case, "[t]here is no text here . . . to which expressions of pre-emptive intent in legislative history might attach." *Isla Petrol.*, 485 U.S. at 501. And reliance on Title XX is similarly unpersuasive. Title XX — unlike Title X — contains an explicit and federally mandated parental-consent requirement. But because Plaintiff does not contend Title X imposes such a requirement, the absence of such a requirement does not cut against Plaintiff's argument that Title X is only a floor, rather than a ceiling.

"Only the written word is the law." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1737 (2020); *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1631 (2018) ("[L]egislative history is not law. 'It is the business of Congress to sum up its own debates in its legislation,' and once it enacts a statute, '[w]e do not inquire what the legislature meant; we ask only what the statute means.'" (quoting *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 396 (1951) (Jackson, J., concurring)) (second alteration in original)); *Magwood v. Patterson*, 561 U.S. 320, 334 (2010) ("We cannot replace the actual text with speculation as to Congress' intent."). None of these cases

[10] These cases largely descend from *Planned Parenthood Federation of America, Inc. v. Heckler*. 712 F.2d 650 (D.C. Cir. 1983). In *Heckler*, the D.C. Circuit heavily relied on the 1977 Senate Committee Report accompanying Title X reauthorization. *See id.* at 660; S. Rep. No. 102, 95th Cong., 1st Sess. 20–26 (1977). The Senate Report only compares levels of patient confidentiality at standalone "family planning clinics" versus "comprehensive health care programs." *See* S. Rep. No. 102, 95th Cong., 1st Sess. 26. By contrast, the 1975 Senate Report stated, "the Committee believes that unmarried teenagers, where feasible, should be encouraged to involve their family in their decision about use of contraceptives." S. Rep. No. 29, 94th Cong., 1st Sess. 55 (1975); *see also* H.R. Rep. No. 158, 97th Cong., 1st. Sess. 1981). And "family encouragement" provisions were added throughout the omnibus bill to other programs related to adolescent sexual health. *See, e.g.*, Pub. L. No. 97-35, § 955(a)(1) (1981). Accordingly, even if the Court were to rely on legislative history, the Court could not conclude that a state law requiring parental involvement would stand as an obstacle to the accomplishment of Section 300(a)'s aims. *Cf. Neese v. Becerra*, No. 2:22-CV-163-Z, 2022 WL 16902425, at *10 (N.D. Tex. Nov. 11, 2022) ("[W]hatever approach," cases like *Heckler* and its progeny "may have used," we may rely on them as "an integral part of our jurisprudence." (quoting *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 287 n.17 (1983)) (alteration in original)); *see also* NELSON, STATUTORY INTERPRETATION 860 (noting the modern Supreme Court has moved away from the type of "constitutional" preemption analysis rooted in the Supremacy Clause and employed in cases like *Heckler*, now favoring "statutory" preemption analysis, which hinges on a court's willingness to read a directive about preemption into the relevant statute).

present an argument based on the text of Section 300(a). Therefore, the Court will not find "federal pre-emption *in vacuo*, without a constitutional text or a federal statute to assert it." *Isla Petrol.*, 485 U.S. at 503.

And setting aside preemption arguments, conditions on the receipt of federal funds must be spelled out in clear and unambiguous language. *See Will v. Mich. Dep't of Police*, 491 U.S. 58, 65 (1989); *South Dakota. v. Dole*, 483 U.S. 203, 207 (1987); *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) ("There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it."). "Because Title X is an exercise of the federal spending power, there must be a clear and unambiguous statement that participating States are forbidden to enforce their parental-involvement laws against Title X projects before the Texas laws can be deemed 'preempted' by the Title X statute." ECF No. 51 at 22. Section 300(a) provides no such statement.

Applying the presumption against preemption, and because "our federal system in general, and the Supremacy Clause in particular, accords pre-emptive effect to only those policies that are actually authorized by and effectuated through the statutory text," the Court holds Section 300(a) does not preempt Section 151.001(a)(6). *Wyeth*, 555. U.S. at 602 (Thomas, J., concurring).

### D. Defendants' Administration of the Title X Program Violates the Constitutional Right of Parents to Direct the Upbringing of Their Children

The Due Process Clause of the Fourteenth Amendment provides heightened protection against government interference with certain fundamental rights and liberty interests. *Reno v. Flores*, 507 U.S. 292, 301–02 (1993). If a due-process challenge implicates a fundamental right or liberty interest, the reviewing court must apply strict scrutiny. *Id.* Under strict scrutiny, States are prohibited "from infringing fundamental liberty interests, unless the infringement is narrowly tailored to serve a compelling state interest." *Lawrence v. Texas*, 539 U.S. 558, 593 (2003) (Scalia,

J., dissenting). If a due-process challenge does not implicate a fundamental right or liberty interest, the law is reviewed under the rational-basis standard. *See, e.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (holding only fundamental rights "deeply rooted in this Nation's history and tradition" qualify for anything other than rational-basis scrutiny (quoting *Moore v. East Cleveland*, 431 U.S. 494, 503 (1977) (plurality op.)).

The Due Process Clause of the Fourteenth Amendment "has been held to guarantee some rights that are not mentioned in the Constitution, but any such right must be 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty.'" *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2242 (2022) (quoting *Glucksberg*, 521 U.S. at 721). The right "to direct the education and upbringing of one's children" is one such right. *Glucksberg*, 521 U.S. at 720; *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925); *compare* Emily Buss, *"Parental" Rights*, 88 VA. L. REV. 635, 655 (2002) ("Among the contemporary claims for protected liberty interests, none has received more widespread and consistent endorsement than a parent's 'fundamental right' to control the upbringing of her children.") *with* MELISSA MOSCHELLA, TO WHOM DO CHILDREN BELONG? PARENTAL RIGHTS, CIVIC EDUCATION AND CHILDREN'S AUTONOMY 180 (2016) ("Strong protections for parental rights are a central component of any just political order whose laws and institutions aim to foster the well-being of its members in both present and future generations.").

"This natural parental right has been characterized as 'essential,' 'a basic civil right of man,' and 'far more precious than property rights.'" *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1976)); *May v. Anderson*, 345 U.S. 528, 533 (1953) (same). Our law did not create this right: it "merely recognizes and respects a bond that already exists by virtue of our human nature." *In re A.M.*, 630 S.W.3d 25, 25 (Tex. 2019)

(Blacklock, J., concurring in denial of petition for review) (orig. proceeding) (mem. op.). "Like the inalienable rights of which the Declaration of Independence speaks, . . . . [w]e were endowed with it by our Creator." *Id.*; *see also* THE DECLARATION OF INDEPENDENCE ¶ 2 (U.S. 1776); WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND, BOOK I OF THE RIGHTS OF PERSONS 288 (Oxford 1st ed. 2016); THOMAS AQUINAS, SUMMA THEOLOGIAE II-II, Q.10, art. 12; Pope Pius XI, *Divini Illius Magistri* 32 (Dec. 31, 1929); ARISTOTLE, ETHICS Bk VIII Ch. XII. And our nation's jurisprudence and legal traditions acknowledge the same. *See Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.); *see also Bellotti v. Baird*, 443 U.S. 622, 639 (1979) ("[D]eeply rooted in our Nation's history and tradition, is the belief that the parental role implies a substantial measure of authority over one's children."); *Parham v. J.R.*, 442 U.S. 584, 602 (1979) ("Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children."); *Yoder*, 406 U.S. at 232 ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition.").

Because a minor generally lacks legal authority to consent to their own care, our common law recognizes a parental right to consent to the medical treatment of one's minor child. *See, e.g.*, *Wallis v. Spencer*, 202 F.3d 1126, 1141–42 (9th Cir. 2000); *Bonner v. Moran*, 126 F.2d 121, 122 (D.C. Cir. 1941) (stating "the general rule is that the consent of the parent is necessary for an operation on a child"); *Zoski v. Gaines*, 271 Mich. 1, 9 (Mich. 1935) (same). Texas, where Plaintiff resides, has long recognized this right. *See, e.g.*, *Moss v. Rishworth*, 222 S.W. 225, 226–27 (Tex. [Comm'n Ap.] 1920, judgm't approved) ("The authorities are unanimous in holding that a surgeon is liable for operating upon a patient, unless he obtains the consent of the patient, if competent to

give such consent, or, if not, of some one who, under the circumstances, would be legally authorized to give the requisite consent. . . . The law wisely reposes in the parent the care and custody of the minor child . . . .").

Similar rationales underly statutory rape laws, which have their origins in the Statutes of Westminster enacted in the 13th century.[11] *See* WILLIAM BLACKSTONE, COMMENTARIES OF THE LAW OF ENGLAND, BOOK IV OF PUBLIC WRONGS 140 (Oxford 1st ed. 2016) ("[C]onsent or non-consent is immaterial, as by reason of her tender years she is incapable of judgment and discretion."). Marriage laws were enacted for similar reasons. *Id.* at 292 ("The consent or concurrence of the parent to the marriage of his child under age, was also *directed* by our antient law to be obtained: but now it is absolutely *necessary*; for without it the contract is void.").

Although parental rights are not "beyond limitation," such rights do not completely disappear with respect to a minor child's sexual activity. *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); *see also Planned Parenthood of Se Pa. v. Casey*, 505 U.S. 833 (1992), *overruled on other grounds by Dobbs*, 142 S. Ct. 2228; *Hodgson v. Minnesota*, 853 F.2d 1452, 1464 (8th Cir. 1988 (en banc), *aff'd*, 497 U.S. 417 (1990) ("The Supreme Court has recognized the significant state interest in providing an opportunity for parents to supply essential medical and other information to a physician."). "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince*, 321 U.S. at 166; *see also Pierce*, 268 U.S. at 535 ("The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.").

---

[11] "This statute was part of the common law brought to the United States." *Michael M. v. Superior Ct. of Sonoma Cnty.*, 450 U.S. 464, 494 n.9 (1981) (Brennan, J., dissenting).

1. Parental rights in the care, custody, and control of their children include the right to direct a child's medical care — which includes the right to consent to contraception.

"The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions." *Parham*, 442 U.S. at 602. "The unique role in our society of the family, the institution by which 'we inculcate and pass down many of our most cherished values, moral and cultural,' requires that constitutional principles be applied with sensitivity and flexibility to the special needs of parents and children." *Bellotti*, 443 U.S. at 634 (quoting *Moore*, 431 U.S. at 503–04 (plurality op.)). The rights of children cannot be equated with those of adults for at least three reasons: (1) "the peculiar vulnerability of children"; (2) "their inability to make critical decisions in an informed, mature manner"; and (3) "the importance of the parental role in child rearing." *Id.* For these reasons, "parental notice and consent are qualifications that typically may be imposed by the State on a minor's right to make important decisions." *Id.* at 640.

Courts have neither abandoned nor fundamentally altered the common-law rule that minors lack the capacity to wholly govern their affairs. Alterations to the common law generally occur for other, unrelated reasons. As one scholar notes:

> a close examination of the line of cases which govern minors' rights to consent to treatment, contraception, abortion, and sterilization, reveals that the changes in these rights have been driven not by a sense that minors are mature enough to make such decisions, but rather, by a belief that certain forms of treatment are so important that the law should facilitate access to them.

Michelle Oberman, *Turning Girls into Women: Re-Evaluating Modern Statutory Rape Law*, 85 J. CRIM. L. & CRIMINOLOGY 15, 49 (1994). For example, although all jurisdictions currently permit minors to consent to care for sexually transmitted diseases, "commentators and supporters interpret these statutes as an extension of the emergency treatment exception to the common law, rather than as a reflection of the minors' maturity and capacity to consent to their own care." *Id.* at 48.

Cases considering minor's ability to consent to such care contain no "substantive discussion of a minor's maturity or capacity to contend with the consequences of sexual relationships." *Id.* at 50.

Although the Fifth Circuit has not addressed the precise intersection of parental rights and a minor's ability to access contraceptives, some courts have held parents lack a right to consent to the distribution of contraceptives to their minor children.[12] *See, e.g.*, *Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health*, 503 F.3d 256 (3d Cir. 2007); *Doe v. Irwin*, 615 F.2d 1162 (6th Cir. 1980). The analysis employed in such cases largely turns on the voluntary nature of access to contraception. *See, e.g.*, *Doe*, 615 F.2d at 1168 ("The State . . . has imposed no compulsory requirements or prohibitions which affect rights of the plaintiffs. It has merely established a voluntary birth control clinic.").

In *Anspach v. City of Philadelphia, Department of Public Health*, a minor visited a health center operated by the City of Philadelphia. 503 F.3d at 259. The minor "had recently engaged in sexual intercourse and feared she may be pregnant." *Id.* The minor provided her name and date of birth to the health center, thereby disclosing she was sixteen years old. *Id.* After seeing a social worker and a registered nurse, the health center provided the minor four tablets of "Nordette," a drug approved by the United States Food and Drug Administration as emergency contraception following sexual intercourse. *Id.* & n.3. The minor was to take two doses of Nordette: one in the presence of a nurse at the health center and one at home. *Id.* at 260. After taking a second dose of Nordette at home, as instructed by the health center, the minor "experienced severe stomach pains

[12] Relying on the "right of privacy," the Supreme Court has held the State may not impose a blanket prohibition on the distribution of contraceptives to minors. *See Carey v. Pop. Servs., Intern.*, 431 U.S. 678, 694 (1977). "That the constitutionally protected right of privacy extends to an individual's liberty to make choices regarding contraception does not, however, automatically invalidate every state regulation in this area." *Id.* at 685–86. The correctness of *Carey*'s holding on blanket bans of contraceptives is also in doubt insofar as it relies on *Eisenstadt v. Baird*, 405 U.S. 438 (1972), and *Griswold v. Connecticut*, 381 U.S. 479 (1965). *See Dobbs*, 142 S. Ct. at 2301 (Thomas, J., concurring) (urging the Court to reconsider *Griswold* because it is "demonstrably erroneous").

and began vomiting." *Id.* The minor's father found her laying on the floor of her room. *Id.* After learning his daughter took emergency contraception, the father called their family physician, the poison control center, and took the minor to an emergency room. *Id.* The minor's parents later sued, alleging a substantive due-process violation based on state interference with family relations. *Id.* at 261.

The Third Circuit rejected the parents' claim. The court reasoned courts have recognized a parental liberty interest only where the behavior of a state actor compels interference with the parent-child relationship. *Id.* Such cases "involve coercion." *Id.* at 262. Because "no one prevented" the minor "from calling her parents before she took the pills she had requested," the health center did not "coerce" the minor child to take the pills. *See id.* at 264–65. Accordingly, the court determined "[t]he type of 'interference' that the Anspachs assert would impose a *constitutional* obligation on state actors to contact parents of a minor or to encourage minors to contact their parents." *Id.* at 262. "Either requirement would undermine the minor's right to privacy and exceed the scope of the familial liberty interest protected under the Constitution." *Id.*

In *Doe v. Irwin*, a class of parents of minor children sued a publicly funded family planning center. *See generally* 615 F.2d 1162. The parents claimed that the distribution of contraceptives to minors without notice to the parents violated the parents' constitutional rights. *Id.* at 1165. Although the center did not seek out or encourage minors to attend the center for contraceptive services, the center permitted minors to visit "either with or without parental consent." *Id.* at 1163. The family planning center's services included prescriptions of contraceptives that were distributed to minors "both with and without parental knowledge or consent." *Id.* Despite not explicitly encouraging minors to attend the family planning center for contraceptive services, the center featured weekly "rap sessions" for minors. *Id.* These rap sessions discussed sexual activity

and methods of birth control, among other things. *Id.* The center would not serve a minor unless the child had first attended at least one weekly rap session. *Id.* at 1164. Upon attending a rap session and scheduling a regular visit with the family planning center, the center would prescribe female minors up to a three-month supply of birth control pills. *Id.*

The Sixth Circuit noted "[t]he Supreme Court has not squarely decided whether a state may impose a requirement of parental notice, as opposed to parental consent, as a condition of a minor's receiving an abortion." *Id.* at 1167 (citing *Bellotti*, 443 U.S. at 654 n.1 (Stevens, J., concurring)). "One fundamental difference," between the case before the Sixth Circuit and cases in which the state had interfered with the rights of parents or the rights of children was that "[i]n each of the Supreme Court cases the state was either requiring or prohibiting some activity." *Id.* at 1168. Because the state "imposed no compulsory requirements or prohibitions which affect rights of the plaintiffs," the court held "[t]he plaintiffs remain free to exercise their traditional care, custody and control over their unemancipated children." *Id.* Accordingly, the Sixth Circuit found "no deprivation of the liberty interest of parents in the practice of not notifying them of their children's voluntary decisions to participate in the activities of the [family planning center]." *Id.*

Unlike *Anspach* and *Irwin*, the United States Supreme Court's decision in *Troxel v. Granville* does not rely on a heavy distinction between "voluntary" and "compulsory" programs. *See generally* 530 U.S. 57 (plurality op.). In *Troxel*, a plurality of the United States Supreme Court addressed the constitutionality of a Washington state statute that permitted "any person" to petition a court for visitation rights "at any time," when such visitation would "serve the best interest of the child." *Id.* at 60 (plurality op.). The Washington Superior Court had granted visitation rights to the grandparents of two minor children in a manner contrary to the wishes of the children's mother. *Id.* at 61 (plurality op.). The Supreme Court held the statute unconstitutional as applied because it

violated the mother's substantive due-process rights. *Id.* at 72 (plurality op.). The Supreme Court recognized parents have a liberty interest "in the care, custody, and control of their children." *Id.* at 65 (plurality op.). The essence of that liberty interest is the right of parents to "make decisions" concerning the reading of their children. *Id.* at 66 (plurality op.). Because the state court employed a "decisional framework" that "directly contravened the traditional presumption that a fit parent will act in the best interest of his or her child," the Supreme Court determined "the [state] court's presumption failed to provide any protection for [the mother's] fundamental constitutional right to make decisions concerning the rearing of her own daughters." *Id.* at 69–70 (plurality op.). In short, the state court substituted its judgment for that of the mother, thereby violating the mother's fundamental constitutional right. *See id.* at 72–73 (plurality op.).

The *Troxel* plurality was concerned that the statute authorized state courts to "disregard and overturn *any* decision by a fit custodial parent concerning visitation whenever a third party affected by the decision files a visitation petition, based solely on the judge's determination of the child's best interests." *Id.* at 67 (plurality op.). The plurality did not fixate on the "mandatory" or "prohibitory" nature of the statute. Instead, they focused on the parent's fundamental right to make decisions for her child. *See id.* at 69 (plurality op.) ("The problem here is not that the Washington Superior Court intervened, but that when it did so, it gave no special weight at all to [the mother's] determination of her daughter's best interests."); *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 276, 289 (5th Cir. 2001) ("The Court [in *Troxel*] found the statute offensive to the parental rights of the mother in that it unconstitutionally interfered with the mother's right to make decisions concerning the upbringing of her child.").

The Supreme Court's emphasis on parental choice and consent "suggests that the right is one of preemption; rather than an absolute right to a certain family relationship, family members

have the right, when confronted with the state's attempt to make choices for them, to choose for themselves." *Valdivieso Ortiz v. Burgos*, 807 F.2d 6, 8 (1st Cir. 1986). "Choices about . . . the upbringing of children are among associational rights this Court has ranked as 'of basic importance in our society,' rights sheltered by the Fourteenth Amendment against the State's unwarranted *usurpation, disregard, or disrespect*." *M.L.B.*, 519 U.S. at 116 (quoting *Boddie*, 401 U.S. at 376) (emphasis added).[13] "[I]n areas which form part of the proper competency of the family . . . the state has a general obligation to assist, but to do so in a way that respects rather than usurps or contradicts the authority of parents." MELISSA MOSCHELLA, TO WHOM DO CHILDREN BELONG? PARENTAL RIGHTS, CIVIC EDUCATION AND CHILDREN'S AUTONOMY 67 (2016).

There are many ways in which the government can infringe on parental rights without the explicit coercion of another. For example, a coercion requirement would presumably condone chemical castration of children in the absence of parental consent — so long as the treatment is "voluntary."[14] A coercion requirement could also prevent parents from becoming aware of what books their children are reading in school and deny them the right to exempt their children from an offensive reading curriculum. *See generally Mozert v. Hawkins Cnty. Pub. Schs.* 827 F.2d 1058 (6th Cir. 1987). These are just a few examples that demonstrate coercion is not required before

[13] Then-Governor Ronald Reagan took this view of parental rights when he vetoed legislation granting teenagers access to contraception: "[This bill] represented the unwarranted intrusion into the prerogatives of parents . . . and would endanger the traditional vital role of the family structure in our society . . . ." Oberman, *Turning Girls into Women: Re-Evaluating Modern Statutory Rape Law*, 85 J. CRIM. L. & CRIMINOLOGY at 50 n.196 (quoting Neil Bodine, *Minors & Contraceptives: A Constitutional Issue*, 3 ECOLOGY L.Q. 859, 860 (1973)).

[14] At least one court has held parents possess a constitutional right to chemically castrate their children. *See, e.g.*, *Eknes-Tucker v. Marshall*, No. 2:22-CV-184-LCB, 2022 WL 1521889, at *8 (M.D. Ala. May 13, 2022). It is difficult to reconcile how parental rights could include the right to give children puberty blockers, but not the right to consent to the distribution of contraception. To the extent that substantive due process might plausibly protect both, they are easily distinguishable. The right to give children puberty blockers is not "deeply rooted," whereas there is virtually no support for the proposition that federally funded clinics can give children birth control without parental consent before the 1970s.

one violates parental rights. A coercion requirement would lead to these (and other) absurd results.[15]

Contraception is a serious matter — both medically and for parents' rights to control the upbringing and education of their children. Several popular methods of birth control carry serious side effects.[16] The courts that have denied parental consent rights apparently presume contraceptive drugs are "no big deal." In *Anspach*, for instance, the Third Circuit relied on a case from the Supreme Judicial Court of Massachusetts where that court distinguished abortion-related parental-consent requirements from contraception, noting "abortion involves a medical procedure, while obtaining a condom does not." 503 F.3d at 268 (citing *Curtis v. Sch. Comm. of Falmouth*, 652 N.E.2d 580, 586 n.9 (Mass. 1995)).

Parental consent does not depend on the particular form of contraception[17] or the environment in which the contraception is distributed. *See Mann v. City of San Diego*, 907 F.3d 1154, 1162 (9th Cir. 2018) ("A parent's due process right to notice and consent is not dependent on the particular procedures involved in the examination, or the environment in which the examinations occur, or whether the procedure is invasive, or whether the child demonstrably

[15] This case does not implicate — and parties do not address — statutes and jurisprudence relevant to bypass protocols in abortion cases. Neither 42 U.S.C. § 300(a) nor Texas Family Code § 151.001(a)(6) address emergency contraception scenarios where bypass protocols may be implicated. Furthermore, though prior Affordable Care Act litigation debated which drugs were or were not "abortifacient," both Plaintiff and Defendants appear to agree that only contraceptive medicine is at issue in the case *sub judice*. *See, e.g.*, *Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Hum. Servs.*, 724 F.3d 377, 390 n.1 (3d Cir. 2013) (Jordan, J., dissenting), *rev'd and remanded sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).

[16] *See, e.g.*, *Are Birth Control Pills Safe?*, PLANNED PARENTHOOD, https://www.plannedparenthood.org/learn/birth-control/birth-control-pill/how-safe-is-the-birth-control-pill ("Complications are rare, but they can be serious . . . In very rare cases, they can lead to death."); *Birth Control Side Effects: Risk and Long-Term Safety of the Pill*, HEALTHLINE (Aug. 3, 2018), https://www.healthline.com/health/birth-control-side-effects ("According to the American Cancer Society, taking birth control pills may increase your risk of breast cancer or cervical cancer over time. The longer you use them, the higher the risk.").

[17] Reliance on condoms — male or female — make up only 19% of the contraceptives distributed to female family planning users in Region VI. *See* HHS Office of Population Affairs, 2021 Title X Family Planning Annual Report 35. By contrast, female sterilization, intrauterine devices, hormonal implants, and hormonal injections make up over half of all distributions. *Id.* And more than four thousand females under the age of 15 received hormonal implants or hormonal injections in 2021. *Id.* at 32.

protests the examinations."). Other courts have therefore reached conclusions contrary to *Anspach* and *Curtis*. In *Alfonso v. Fernandez*, for instance, a New York court held a high school condom-distribution program violated parental rights to rear children as parents see fit. *See generally* 195 A.D.2d 46 (1993). Although the high school program was "wholly voluntary," such voluntariness did not "constitute proof that the petitioners [were] not being forced to surrender a parenting right — specifically, to influence and guide the sexual activity of their children without State interference." *See id.* at 54, 56 ("[R]egulations which authorize condom distribution without prior parental consent or opt out are *contrary to the common law* and of no effect." (emphasis added)).

Additionally, omitting parental consent gives insufficient weight to the undesirability of teenage promiscuity. *Cf. Michael M.*, 450 U.S. at 471–72 ("The statute at issue here protects women from sexual intercourse at an age when those consequences are particularly severe."). Requiring coercion ignores that minors under the age of consent — provided they are sexually active — are often victims of statutory rape. *See* TEX. PENAL CODE § 22.011(a), (c). Treating information that a minor was raped as "confidential" drastically disrespects and disregards parental rights. And the voluntary-compulsory dichotomy ignores that the use of contraception (just like abortion) violates traditional tenets of many faiths, including the Christian faith Plaintiff practices.[18]

For centuries, the common law held minors were incapable of giving consent to make important life decisions. No Supreme Court case has disposed of this deeply rooted right of parents to make important life decisions for their children. One cannot find the Third and Sixth Circuits'

[18] *See, e.g.*, JEROME, AGAINST JOVINIAN 19 ("Does [Onan] imagine that we approve of any sexual intercourse except for the procreation of children?"); CATECHISM OF THE CATHOLIC CHURCH 2399 ("Legitimate intentions on the part of the spouses do not justify recourse to morally unacceptable means (for example, direct sterilization or contraception)"); Pope Paul VI, *Humanae Vitae* 14 (July 25, 1968) (describing sexual intercourse which is deliberately contraceptive as "intrinsically wrong"). Of course, Christianity also teaches fornication is illicit. "Moreover, it is a grave scandal when there is corruption of the young." CATECHISM OF THE CATHOLIC CHURCH 2353.

voluntary-compulsory distinction in any controlling precedent or the history of parental rights in this nation or pre-dating it. A voluntary-compulsory distinction fails to protect the precious and fundamental liberty interests of parents. Accordingly, the Court will not read such a distinction into our jurisprudence, the Fourteenth Amendment, the common law, or the whole of parental rights as bestowed by something greater. Instead, the Court holds the right of parents to consent to the use of contraceptives is "deeply rooted in this Nation's history and tradition," whether framed as "voluntary" or "compulsory." *Dobbs*, 142 S. Ct. at 2242 (quoting *Glucksberg*, 521 U.S. at 702).

2. <u>No countervailing interest justifies the government's disregard for Plaintiff's parental rights.</u>

Because the Court has held the right of parents to consent to their minor children's use of contraceptives is deeply rooted in this Nation's history and tradition, the Court must next determine whether infringement of this right is narrowly tailored to advance a compelling governmental interest. *See Flores*, 507 U.S. at 302 (reaffirming due process "forbids the government to infringe certain 'fundamental' liberty interests *at all*, . . . unless the infringement is narrowly tailored to serve a compelling state interest"). The Court finds no compelling governmental interest justifies Defendants' disregard of Plaintiff's parental rights in this case.

Defendants do not attempt to identify any such interest. Defendants instead insist rational-basis review applies. *See* ECF No. 53 at 35–37.[19] In doing so, Defendants assert Title X's goal of "promot[ing] minors' reproductive health" is "not merely legitimate but 'substantial.'" *Id.* at 35. Even if so, a substantial governmental interest is not a compelling governmental interest. *Cf. Doe I*

[19] Defendants cite *Littlefield* in support of the proposition that a rational-basis test applies when reviewing claims for alleged violations of parental rights to direct a child's upbringing. ECF No. 53 at 35–37. However, *Littlefield* explicitly reserves this standard for parental rights "concerning public education" and "in the public school context." 268 F.3d at 291.

*v. Landry*, 909 F.3d 99, 109 (5th Cir. 2018) (explaining how a "substantial governmental interest" relates to intermediate scrutiny on a First Amendment free-speech challenge).

Even if Defendants possessed a compelling governmental interest, their actions would be unnecessary to achieve that interest. In *Alfonso* — for example — the New York court agreed "the State has a compelling interest in controlling AIDS, which presents a public health concern of the highest order." 195 A.D.2d at 53. But when considering whether it would be difficult for students to acquire condoms without the high school condom-distribution program at issue, the court reasoned "[t]he answer must clearly be no." *Id.* at 58. To be sure, Defendants do not identify controlling AIDS as one of the governmental interests Title X advances. Again, Defendants do not attempt to identify any compelling governmental interest advanced by not requiring parental consent before a state entity may provide minor children contraception. The interest Defendants do advance concerns the undesirability of adolescent pregnancy and the consequences thereof, an interest this Court implicitly considered above when analyzing the need for parental involvement. *See* ECF No. 52 at 36. Accordingly, no countervailing compelling governmental interest justifies Defendants' intrusion of Plaintiff's parental rights.

**CONCLUSION**

Defendants' administration of the Title X program violates the constitutional right of parents to direct the upbringing of their children and Texas Family Code § 151.006(a)(6). For the foregoing reasons, the Court **GRANTS** Plaintiff's Motion and renders summary judgment for Plaintiff on all claims. The Court **DENIES** Defendants' Cross-Motion. The Court **DENIES** all other relief not expressly stated herein. The Court **ORDERS** parties to submit competing proposed judgments **within 7 days** of the date of this Opinion and Order.

**SO ORDERED.**

December 8, 2022

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE